## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**FRANCISCO RODRIGUEZ ROMERO,
ET AL.**

**CIVIL ACTION**

**VERSUS**

**NO. 25-1106-JWD-EWD**

**SCOTT LADWIG, ET AL.**

### RULING AND ORDER

Before the Court is a Petition for Writ of Habeas Corpus filed on December 11, 2025, by Petitioners Francisco Rodriguez Romero, Ricardo Blanco Chomat, Luis Gaston Sanchez, and Ibrahim Mohammed. Petitioners are currently in the custody of the U.S. Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"), at the civil detention facility at the Louisiana State Penitentiary. They have filed a petition for writ of habeas corpus under 28 U.S.C. § 2241, challenging the procedures used to re-detain them and their continued detention as violating applicable statutes, regulations, and due process rights. (Doc. 1.) Respondents have filed an opposition. (Doc. 18.) Petitioners have filed a reply. (Doc. 20.) The Court heard oral argument on January 7, 2026. (Doc. 25.) As stated by another district court with a case similar to this one:

> The circumstances here mirror those in numerous recent habeas cases involving re-detained noncitizens [previously] released on supervision. In the substantial majority of these cases, courts have granted relief after finding that the Government failed to identify sufficient changed circumstances or demonstrate a significant likelihood of removal in the reasonably foreseeable future. . . . These cases reflect a broader pattern. District courts nationwide have consistently granted habeas relief to similarly situated petitioners.

*Phongsavanh v. Williams*, — F. Supp. 3d —, 2025 WL 3124032, at *4 (S.D. Iowa Nov. 7, 2025) (collecting cases).[1]

---

[1] Petitioners have also collected at least 25 similar cases that courts across the country have decided in the last six months. (*See* Doc. 20-1.) This is nowhere near an exhaustive list.

Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court now grants the Petition for Writ of Habeas Corpus.

## I.     BACKGROUND

Petitioners are four noncitizen residents of the United States who were, at different times, detained by ICE and released on ICE's own determination that supervised release was appropriate.[2] In deciding to grant supervised release, ICE found that each of these men was not a flight risk, each was nonviolent and likely to remain nonviolent, each posed no threat to society, and each was likely to comply with any conditions of release.[3] And so, being unable to deport them to their home countries, ICE released each Petitioner—with conditions of supervision—to live their lives free of confinement in the United States.[4]

Most of these Petitioners have lived in this country for decades. They have complied with all of ICE's conditions of supervised release. They have established lives, jobs, communities, and families, and have enjoyed relatively free lives in the United States. Until the summer of 2025. Three Petitioners went to their regularly scheduled ICE check-in appointments and never went

---

[2] Respondents assert that "[n]o matter how Petitioners color it, each of them was a criminal." (Doc. 18 at 2.) That is exactly right—each *was* convicted of a crime, and each served his sentence. And then ICE itself determined that each should be released into regular, free civilian life. Petitioners' criminal histories are not at issue here, and the parties have not suggested that any part of this case would be different for similarly situated petitioners without the same criminal history. In short, Respondents' assertion that Petitioners were criminals is irrelevant to the analysis here.

[3] Regulations require such findings before supervised release:

> Criteria for release. Before making any recommendation or decision to release a detainee, a majority of the Review Panel members, or the Director of the HQPDU in the case of a record review, must conclude that:
> (1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;
> (2) The detainee is presently a non-violent person;
> (3) The detainee is likely to remain nonviolent if released;
> (4) The detainee is not likely to pose a threat to the community following release;
> (5) The detainee is not likely to violate the conditions of release; and
> (6) The detainee does not pose a significant flight risk if released.

8 C.F.R. § 241.4(e). Further factors to weigh include, *inter alia*, criminal history, mental health, participation in work or educational programs, ties to the United States, prior immigration history. *Id.* § 241.4(f).

[4] Neither party has provided the documents establishing supervised release, but there is no dispute that each Petitioner was released under conditions of supervision.

home; the fourth was taken directly from his home. Respondents argue that Petitioners were detained in order to effectuate their deportation; but months later, all remained in ICE lockup at Angola prison—an ostensibly civil detention center on the grounds of the state's only maximum-security prison.[5]

Petitioners challenge the legality of the revocation of their Orders of Supervision ("OSUPs") and re-detention under Fifth Amendment due process, both procedural and substantive; specifically, they argue that ICE violated their due process rights by failing to follow its own regulations governing revocation of an OSUP. (Doc. 1 at 34–36.) Petitioners further challenge the legality of their continued detention under 8 U.S.C. § 1231(a)(6), because their deportation is not reasonably foreseeable. (Doc. 1 at 37.)

Petitioner Francisco **Rodriguez Romero** is a 72-year-old Cuban citizen who has lived in the United States for 45 years, having fled Cuba in 1980. (Doc. 1 at 12.) He has Parkinson's and Alzheimer's diseases, bipolar disorder with psychosis, and other medical conditions. (*Id.*) He requires at least ten prescription medications daily and certain assistive devices, like an inhaler and an oxygen mask for sleeping. (*Id.*) He was released on an OSUP in 1997, with renewals in 2004 and 2013. (Doc. 1 at 13; Doc. 18-3 at 2.) He has lived for 28 years in Puerto Rico, working for two decades as an addiction counselor. (Doc. 1 at 13.) He has been married to his U.S. citizen wife for over 20 years. (*Id.* at 14.) Through this time, he reported to ICE for regular check-ins and abided by the conditions of his OSUP. (*Id.* at 13.) On August 6, 2025, he reported for his regular check-in at the ICE office in San Juan, where he was informed that his OSUP had been revoked. (*Id.* at 14.) Rodriguez Romero remains in ICE custody.

---

[5] The Louisiana State Penitentiary is more commonly known as Angola. The ICE detention facility on its grounds is also known as Camp 57, and is located in the former Camp J, a solitary confinement unit.

Petitioner Ricardo **Blanco Chomat** is a 61-year-old Cuban citizen who has lived in the United States for 52 years; he was evacuated from Cuba on a U.S.-backed Freedom Flight in 1973, when he was 8 years old. (*Id.* at 16.) He was released on an OSUP in 2004. (Doc. 18-4 at 2.) For more than 14 years, he has been the primary caretaker of his disabled adult brother; he is close with his ex-wife and his daughter. (Doc. 1 at 17–18.) He has maintained employment authorization and remained employed as a landscaper and mechanic. (*Id.* at 18.) For the entirety of his over 20 years of supervised release, he has complied with ICE's conditions of release. (*Id.* at 17.) On June 25, 2025, he reported for his regularly scheduled check-in at the ICE office in Miramar, where he was told that his OSUP had been revoked. (*Id.* at 18.) Blanco Chomat remains in ICE custody.

Petitioner Luis **Gaston Sanchez** is a 66-year-old Cuban citizen who has lived in the United States for 59 years, having arrived on a Freedom Flight in 1966. (*Id.* at 19.) He was released on an OSUP in 2023 and complied with its conditions faithfully. (*Id.* at 20.) He maintained employment authorization and a job in maintenance, paid taxes, and built his relationship with his family. (*Id.*) On June 25, 2025, he reported for his regularly scheduled check-in at the ICE office in Miramar, where he was detained with little explanation. (*Id.* at 20–21.) Gaston Sanchez remains in ICE custody.

Petitioner Ibrahim **Mohammed** is a 43-year-old Ethiopian citizen who has lived in the United States for 11 years. (*Id*. at 24.) After receiving protection from deportation to Ethiopia under the Convention Against Torture ("CAT"), he was released on an OSUP on November 27, 2024. (*Id.* at 24–25.) He complied with the conditions of release and integrated into his community by holding jobs and participating in his local mosque. (*Id.* at 25.) On July 17, 2025, he arrived home to roughly 10 ICE officers, who detained him and eventually informed him that his OSUP had been revoked. (*Id.* at 25–26.) Mohammed remains in ICE custody.

II.   LEGAL STANDARD

A.   **Immigration Statutes and Regulations**

When a noncitizen is ordered removed from the United States, the Immigration and Nationality Act ("INA") requires that removal (deportation) occur within ninety days. 8 U.S.C. § 1231(a)(1)(A). That 90-day removal period begins on the latest of three dates: (1) when the removal order becomes final, (2) when there is a final order in a stay of removal, or (3) when the noncitizen is released from non-immigration custody, such as the completion of a criminal sentence. *See id.* § 1231(a)(1)(B). During this initial 90-day detention, the government must attempt to remove the noncitizen. *Id.* § 1231(a)(1); 8 C.F.R. § 241.4(g)(1)(ii).

Detention may be extended beyond the 90-day period in specific circumstances that are not at issue here.[6] Additionally, the Supreme Court has recognized that the Government may practically need more time to arrange for a noncitizen's travel to another country; and so, the Government may detain a noncitizen only for as long as is "reasonably necessary" to effectuate deportation, within the limits of the Constitution. *Zadvydas v. Davis*, 533 U.S. 678, 689–90 (2001). But the Government may not, consistent with the Due Process Clause, detain a noncitizen indefinitely. *Id.* at 697; *see also Villanueva v. Tate*, 801 F. Supp. 3d 689, 695 (S.D. Tex. 2025). Having established that indefinite detention is unconstitutional, the Supreme Court established a guide for lower courts: a presumption that six months is a reasonable period of post-removal-order detention. *Zadvydas*, 533 U.S. at 701. But in any case, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of

---

[6] If the noncitizen fails or refuses to apply in good faith for travel documents as directed by ICE (8 C.F.R. § 241.4(g)(1)(i)); if the noncitizen is inadmissible under 8 U.S.C. § 1182; or if the noncitizen has committed certain crimes, and the government determines that the noncitizen poses a risk to the community or is a flight risk (8 U.S.C. § 1231(a)(6)). None of these circumstances apply to Petitioners.

removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. If the Government cannot rebut the petitioner's showing, it must release the petitioner. *Johnson v. Guzman Chavez*, 594 U.S. 523, 529 (2021) (citing *Zadvydas*, 533 U.S. at 701).

ICE may release a detainee on a supervisory basis—under an OSUP—after concluding that immediate deportation is not practicable, and that the detainee is non-violent, likely to remain non-violent, not likely to pose a threat to the community, not likely to violate conditions of release, and not a significant flight risk. 8 C.F.R. § 241.4(e); *see also id.* § 241.4(h)(3), (i)(6) (noting that the Executive Associate Commissioner and district director "must [also] be able to reach the conclusions set forth in paragraph (e) of this section" "[b]efore making any decision to release a detainee"). Additional factors for consideration of supervised release include, among others, criminal history and evidence of either recidivism or rehabilitation, family ties to the United States, and the detainee's likelihood of adjusting to life in community. *Id.* § 241.4(f).

Once a noncitizen has been released under an OSUP, there are detailed regulations concerning when and how that OSUP may be revoked. *See id.* § 241.13(i). Generally speaking, the OSUP may be revoked if the noncitizen violates any of the conditions of release. *See id.* § 241.13(i)(1). An OSUP may also be revoked to enforce a removal order when, "on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(2). When an OSUP is revoked, the noncitizen must "be notified of the reasons for revocation of his or her release" and must be afforded an "initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation." *Id.* § 241.13(i)(3).

**B.      Habeas Relief**

Petitioners seek release through a petition for writ of habeas corpus under 28 U.S.C. § 2241.[7] To be entitled to the issuance of a writ of habeas corpus, a petitioner must show that he is "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995) (per curiam) ("[N]either habeas nor civil rights relief can be had absent the allegation by a plaintiff that he or she has been deprived of some right secured to him or her by the United States Constitution or the laws of the United States." (quoting *Hilliard v. Bd. of Pardons & Paroles*, 759 F.2d 1190, 1192 (5th Cir. 1985) (per curiam))). A habeas petitioner "bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence." *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (citing *Parke v. Raley*, 506 U.S. 20, 31 (1992)); *see also Bruce v. Estelle*, 536 F.2d 1051, 1058 (5th Cir. 1976). A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

In determining whether a period of immigration detention is unconstitutionally prolonged, the Supreme Court directed federal habeas courts to determine "whether the detention in question exceeds a period reasonably necessary to secure removal" and to "measure reasonableness primarily in terms of the statute's basic purpose, namely, assuring the [noncitizen]'s presence at the moment of removal." *Zadvydas*, 533 U.S. at 699. If removal is not "reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.*

---

[7] Respondents assert that conditions of confinement are appropriately challenged through a civil rights suit under § 1983 or *Bivens* rather than habeas. The Court need not address this argument, as Petitioners do not challenge the conditions of their confinement. While the Petition does illustrate the conditions of their confinement, the legal basis of Petitioners' habeas claim is the unlikelihood of deportation under *Zadvydas* and due process violations. Success on either of these claims would "entitle [Petitioners] to accelerated release," and so habeas is the appropriate vehicle. (*See* Doc. 18 at 4 (quoting *Melot v. Bergami*, 970 F.3d 596, 599 (5th Cir. 2020)).)

at 699–700. "When the Court finds that a petitioner's constitutional rights have been violated, the petitioner is entitled to the issuance of the requested writ." *Villanueva*, 801 F. Supp. 3d at 697.

## III.    DISCUSSION

Noncitizens, even those who have been ordered removed from the country, are protected by the Constitution. *See Zadvydas*, 533 U.S. at 693. The Government may not execute removal proceedings in violation of due process. *See Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings.") (internal quotation omitted). Nor may it execute removals in violation of its own regulations. *See Gulf States Mfrs., Inc. v. Nat'l Labor Relations Bd.*, 579 F.2d 1298, 1308 (5th Cir. 1978) ("It is well settled that an Executive Agency of the Government is bound by its own regulations, which have the force and effect of law, and the failure of an agency to follow its regulations renders its decision invalid."); *see also Gov't of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir. 1970) ("It is equally well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it." (citing cases)). With these principles in mind, the Court will consider whether the Government violated Petitioners' constitutional rights, and whether Petitioners are entitled to habeas relief.

### A.    Re-Detention Without Due Process

Petitioners argue that their re-detentions are unlawful because (1) their OSUPs were revoked and detention reinstated without properly articulated purpose, in violation of ICE regulations and substantive due process rights; and (2) they were re-detained without notice or opportunity to be heard, in violation of ICE regulations and procedural due process rights. (Doc. 1 *passim*.) Respondents do *not* assert that ICE followed its own regulations ensuring due process,

(Doc. 26 at 18–20); instead, they argue that any procedural defects of Petitioners' re-detention were harmless error or "mere irregularities or errors of law" that can be cured and do not merit habeas relief. (Doc. 18 at 18, 23.)

### 1. Reason for Revocation

Once a noncitizen has been released from detention under an OSUP, it may be revoked (1) if the noncitizen violates his conditions of release, (2) in order to carry out deportation, (3) if the purpose of release has been served, or (4) if the noncitizen's conduct or another circumstance indicates that release is no longer appropriate. 8 C.F.R. §§ 241.13(i), 241.4(l)(2). Respondents have not argued that these Petitioners were re-detained because they violated their conditions of release, that the purpose of release has been served, or that release is no longer appropriate.[8] As discussed below, the only stated reason for Petitioners' re-detention—where a reason was stated—was to effectuate deportation.[9]

If an OSUP is revoked for the purpose of effectuating deportation, ICE must show that "on account of changed circumstances, . . . there is a **significant likelihood** that the [noncitizen] may be removed in the **reasonably foreseeable** future." 8 C.F.R. § 241.13(i)(2) (emphasis added). That is, in order to re-detain a formerly released noncitizen, it is ICE's burden to show that the noncitizen's removal from the country is significantly likely to occur in the reasonably foreseeable future.[10] *See Garcia-Aleman v. Thompson*, No. 25-886, 2025 WL 3534806, at *4 (W.D. Tex. Nov.

---

[8] Though Respondents' proffered declarations of Assistant Field Office Director Lisa Fruge-Prudhome assert that Gaston Sanchez (Doc. 18-1 at 3–4), Blanco Chomat (Doc. 18-4 at 2), and Mohammed (Doc. 18-5 at 2) missed one or more check-in appointments, Petitioners have put forth evidence—both declarations and supporting documents—showing that those appointments were attended or were rescheduled and attended. (Gaston Sanchez: Doc. 20-4 at 2–3, Doc. 20-10; Blanco Chomat: Doc. 20-3 at 2–5, Docs. 20-6, 20-7, 20-8, 20-9; Mohammed: Doc. 20-5 at 2, Doc. 20-11.) Further, even if Respondents believe these appointments were missed, they have not argued—either at the time of re-detention or now—that Petitioners were re-detained on that basis.

[9] Previewed here and discussed below, one Petitioner was not given any reason for revocation.

[10] This standard will be repeated quite often throughout this discussion. For brevity's sake, the Court may occasionally shorten it to "likely," "significantly likely," "foreseeable," "reasonably foreseeable," or the like, but note that the entire standard—*significantly likely in the reasonably foreseeable future*—must apply.

24, 2025), *report and recommendation adopted*, No. 25-886, 2025 WL 3532179 (W.D. Tex. Dec. 9, 2025) (collecting cases). "The changed circumstances that make an [noncitizen]'s removal likely in the foreseeable future must have existed at or before the OSUP revocation; post-hoc justifications are inadequate." *Munagi v. McDonald*, No. 25-13175, 2025 WL 3688023, at *2 (D. Mass. Dec. 19, 2025); *see also Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 788 (D. Minn. 2025) (finding that revocation was unlawful where ICE was not informed that Jamaica would issue petitioner travel documents until after his OSUP had been revoked); *M.S.L. v. Bostock*, No. 25-1204, 2025 WL 2430267, at *13 (D. Or. Aug. 21, 2025) (citing cases); *Zhang v. Genalo*, No. 25-6781, 2025 WL 3733542, at *10 (E.D.N.Y. Dec. 28, 2025) (quoting *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 163 (W.D.N.Y. 2025)).

The First Circuit has found that Section 241.13(i) requires an individualized finding that deportation has become significantly likely in the reasonably foreseeable future. *Kong v. United States*, 62 F.4th 608, 619–20 (1st Cir. 2023). One court in this Circuit has declined to adopt this stance, stating instead that while "there must be changed circumstances that there is a significant likelihood that the particular [noncitizen] may be removed in the reasonably foreseeable future . . . it does not follow that there must be changed circumstances that are particular to [the petitioner]." *Nguyen v. Noem*, 797 F. Supp. 3d 651, 665–66 (N.D. Tex. 2025). In other words, "[t]he changed circumstances need to be applicable to [the petitioner], but that does not mean that they must be unique to [the petitioner]." *Id.* at 666. On this point, the Court does not disagree—a broad change in circumstance can, indeed, be the change that merits an individualized finding that deportation has become significantly likely. But *Nguyen* takes this idea one step further, rejecting *Kong* and an individualized determination entirely, relying on an assumption that a broad change in circumstance affecting a group necessarily affects all group members equally. *Id.*

The Court disagrees and finds *Kong* more persuasive than *Nguyen*. The regulation provides that ICE may revoke release in order to effectuate deportation "if, on account of changed circumstances, the Service determines that there is a significant likelihood that **the alien** may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2) (emphasis added). This clearly refers to the individual detainee, not any broad group to which the detainee belongs. *Accord Kong*, 62 F.4th at 619–20. While *Nguyen* is correct that a broad policy may constitute a changed circumstance that affects an entire class, such a change does not necessarily make deportation "significantly likely" for every individual in the class. For example, improved diplomatic relations with Cuba could make it generally more likely that Cuban detainees might be deported there. But, if Cuba were accepting only those Cuban national deportees with no criminal record, then the Cuban Petitioners here would be no more likely to be removed to Cuba than before diplomatic relations improved. Thus, *Kong* is not only more in line with the plain language of the regulation, but it is also a more reasonable interpretation of that regulation. While the changed circumstance need not be unique to the petitioner, it does need to affect the likelihood of the individual petitioner's removal, hence the individualized determination. For these reasons, the Court rejects Respondents' reliance on *Nguyen* and finds that, in order to revoke an OSUP for the purpose of effectuating deportation, ICE must find a significant likelihood of removal as to the individual noncitizen in question.

Here, Petitioners argue that ICE did not make any such finding of a likelihood of deportation in deciding to revoke Petitioners' OSUPs and re-detain them. In response to this assertion, Respondents were able to produce a Notice of Revocation of Release for only two of the four Petitioners; the stated reasons for their re-detention are: "ICE has determined that you can be expeditiously removed from the United States. . . . Your case is under review by Cuba for the

issuance of a travel document." (Rodriguez Romero, Doc. 18-8 at 1; and Blanco Chomat, Doc. 18-6 at 1.) Petitioner Mohammed asserts that he was given a Notice of Revocation,[11] and that the reason stated was that his case was under review by France, the UK, Australia, Germany, and Canada for the issuance of a travel document. (Doc. 1 at 26.) Finally, for Petitioner Gaston Sanchez, Respondents have not provided *any* documents regarding the revocation of his OSUP, much less one that demonstrates a significant likelihood of his removal in the reasonably foreseeable future. (*See* Doc. 18 at 15.) The Court will take each Petitioner's revocation of release in turn.

**Gaston Sanchez.** The lack of Notice of Revocation or any other evidence of the reason for revocation of Gaston Sanchez's OSUP makes clear that Gaston Sanchez was re-detained with no legitimate reason. Not only has the government shown no reason for revoking his OSUP, but it has not even shown that his OSUP *was* revoked. To this point, Respondents allege that a "Warrant of Removal/Deportation" was issued on the day he was re-detained, (Doc. 18-1 at 4)—this document is not in the record, and Respondents have not explained what this document is or what actions, if any, it compels; in any case, it was not a Notice of Revocation of Release. Per the declaration of Lisa Fruge-Prudhome, New Orleans Assistant Field Office Director of DHS/ICE Enforcement and Removal Operations,[12] Gaston Sanchez was not sent any other documents regarding his custody until September 30, after he had been in custody for over three months. (Doc. 18-1 at 4.) There being no documentation of the revocation of his release, who authorized it, or for what reason, the Government clearly failed to carry its burden to show that there was a significant likelihood of Gaston Sanchez's removal justifying his re-detention. *See, e.g.*, *Villanueva*, 801 F. Supp. 3d at 699–700 ("In the absence of some evidence showing that Villanueva's Order of

---

[11] He asserts he received this document only in English, in which he has limited proficiency; his native language is Amharic. ICE is unable to locate this document. (Doc. 18 at 15.)

[12] Declarations by AFOD Lisa Fruge-Prudhome will hereinafter be referred to as the Prudhome declarations.

Supervision was lawfully revoked by someone with the authority to do so and for a reason lawfully permitted, the government has failed to show that it afforded [petitioner] with due process in connection with the purported revocation of his Order of Supervision.").

**Mohammed.** Mohammed asserts that he was given a Notice of Revocation in English, in which he has limited proficiency, and that he did not understand why he was being detained. (Doc. 1 at 26.) Mohammed alleges that the Notice stated that he was being detained due to undefined "changed circumstances" and because his case was "under current review by France, United Kingdom, Australia, Germany, and Canada for the issuance of a travel document." *Id.* ICE had been unable to deport him to these countries prior to his release on OSUP eight months earlier. *Id.* Because ICE had very recently failed to deport Mohammed to the five countries listed in the Notice of Revocation, it cannot be said that there was a significant likelihood that he could be removed to one of those countries absent some changed circumstance between the first attempt to deport him and his re-detention. But no such change was articulated. The conclusory statement that there were "changed circumstances" and alleged review by countries that very recently did not accept this Petitioner cannot establish a significant likelihood of removal in the reasonably foreseeable future. *See, e.g.*, *Abuelhawa v. Noem*, No. 25-4128, 2025 WL 2937692, at *9 (S.D. Tex. Oct. 16, 2025) ("[T]he Government fails to meet its burden where it provides only conclusory statements as to the likelihood of removal.") (citing cases). And so, the Government failed to carry its burden to show that there was a significant likelihood of Mohammed's removal justifying his re-detention.

**Rodriguez Romero.** The Notice of Revocation given to Rodriguez Romero upon his re-detention was written only in English, which Rodriguez Romero cannot read. (Doc. 1 at 14.) It states that the revocation was based on "a determination that there are changed circumstances in

[his] case," that "ICE has determined that [he] can be expeditiously removed from the United States," and that his "case is under current review by Cuba for the issuance of a travel document." (Doc. 18-8 at 1.) Rodriguez Romero's removal order was entered on May 30, 1995, and he was detained for over two years while the Government attempted to remove him to Cuba or elsewhere, before being released on an OSUP in July 1997.[13] (Doc. 1 at 13.) For 28 years—from 1997 to 2025—ICE was unwilling or unable to remove Rodriguez Romero to his native Cuba; in fact, renewed OSUPs in 2004 and 2013 indicate that ICE was actively evaluating his case through the years. (Doc. 18-3 at 2.) While the Notice of Revocation indicates that Cuba was reviewing Rodriguez Romero's eligibility for acceptance into Cuba, the conclusory assertion of "changed circumstances" does not explain why, after nearly three decades of not accepting Rodriguez Romero into Cuba, the Government thought that Cuba's review of his case in 2025 would turn out any differently; Respondents have not attempted to identify such a changed circumstance even after the fact. In fact, Cuba refused to accept Rodriguez Romero on this occasion, too.[14] (Doc. 18 at 3.) Without a finding of changed circumstances, ICE did not meet its burden to show a significant likelihood of removal in the reasonably foreseeable future when Rodriguez Romero's case was merely under review by a country that had already rejected him.

---

[13] Petitioner asserts that his OSUP was entered in July 1997. The Prudhome declaration acknowledges his removal order of May 30, 1995, but makes no mention of a 1997 OSUP. It does state that on "September 23, 2004, and June 17, 2003, ICE placed Petitioner on Orders of Supervision"; there is no indication why two separate OSUPs were needed. (Doc. 18-3 at 2.) This statement, however, does not purport to be a complete accounting of Petitioner's ICE history, only one that is "true and correct." *Id.*

[14] The stated reason for re-detention of both Rodriguez Romero and Blanco Chomat was review by Cuba. Respondents concede that Cuba refused to accept both of these Petitioners at some time after their re-detention but before Respondents filed their opposition to the Petition. (Doc. 18 at 3.) This Court has seen no guidance on what should happen when the stated reason for revocation of release falls through, and thus the significant likelihood of removal vanishes. But the internal logic of ICE's regulations and the impermissibility of post-hoc rationalizations suggest that return to release under the OSUP would be appropriate. *See Marquez-Amaya v. Thompson*, No. 25-1501, 2025 WL 3654327, at *6 (W.D. Tex. Dec. 15, 2025) ("The Government cannot cure the wrongful commencement of detention through after-the-fact determinations of potential expeditious removal.")

**Blanco Chomat.** In the Petition, Blanco Chomat asserts that he was not given a Notice of Revocation, but that on the day of his re-detention, he was told that Cuba was not accepting him. (Doc. 1 at 18.) Respondents have produced a Notice of Revocation for Blanco Chomat on the date of his re-detention, marked to indicate that he refused to sign the acknowledgment of receipt.[15] (Doc. 18-6 at 1–2.) Because Respondents have produced it, the Court will assume Blanco Chomat did receive this document. This Notice of Revocation is substantially identical to Rodriguez Romero's, citing conclusory "changed circumstances," the determination that Blanco Chomat can be "expeditiously removed," and that his case is "under review by Cuba." (*Id.* at 1.) Blanco Chomat was released on his OSUP in 2003 or 2004. (Doc. 1 at 17; Doc. 18-4 at 2.) For over two decades, ICE has failed to remove him to Cuba, and the Notice of Revocation does not indicate any changed circumstances that would have suggested a different outcome for his re-detention in 2025. For the same reasons listed above as to Rodriguez Romero, ICE failed to meet its burden to show a significant likelihood of removal in the reasonably foreseeable future.

## 2.    Right to Challenge Revocation

In addition to requiring a significant likelihood of removal in order to revoke an OSUP, ICE's regulations provide that a noncitizen being re-detained must be informed of the reason for revocation and afforded an "initial informal interview promptly after [his] return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation." 8 C.F.R. § 241.13(i)(3). The Notice of Revocation of Release also assures detainees that they will have this opportunity to respond: "You will promptly be afforded an informal interview at which you will be given an opportunity to respond to the reasons for the revocation. You may submit any evidence or information you wish to be reviewed in support of your release." (*See, e.g.*, Doc. 18-8 at 1.)

---

[15] N.b., the other Notice of Revocation in the record, Rodriguez Romero's, is not signed by Rodriguez Romero, but is not marked "Refused to Sign." (Doc. 18-8 at 2.)

While the regulations do not give exact specifications for what constitutes an acceptable informal interview, the purpose stated in the regulations is clear: a detainee must have an opportunity to respond to and contest the reason for re-detention. None of the Petitioners received such an interview. Respondents do not argue otherwise. (Doc. 26 at 19–20 ("[Judge]: They didn't get an initial interview . . . that the regulation says they're entitled to. Am I correct about that? [Respondent]: We don't have any documentation, Your Honor, that they were given— [Judge]: Meaning that they didn't get it. Right? [Respondent]: Yes, Your Honor.").) Respondents argue that Petitioners have now been afforded the opportunity to rebut their re-detention in federal court, and so the lack of interview is cured. (Doc. 18 at 21–22.) The Court cannot agree. Arguments before the Court are not arguments to ICE; and more importantly, the intent of the interview is to contest re-detention and avoid erroneous deprivation of a noncitizen's liberty. *See* 8 C.F.R. § 241.13(i)(3). Nothing this Court can do can retroactively cure the lack of process resulting in Petitioners' wrongful detention;[16] indeed, "additional process would not so much cure their unconstitutional detention as prolong it." (Doc. 26 at 17, Petitioner.)

### 3.    Availability of Habeas Relief for Due Process Violations

Having found that ICE failed to comply with its own regulations when revoking Petitioners' OSUPs and re-detaining them, the Court now turns to Respondents' argument regarding the availability of habeas relief. (Doc. 13 at 13–18; Doc. 18 at 13–24.)

Respondents note that habeas is only available to "correct unlawful imprisonment or custody based on the denial of fundamental constitutional rights." (Doc. 13 at 15.) It may "not be

---

[16] For similar reasons, the Court rejects the notion—briefly referenced by Respondents—that the process owed to Petitioners simply has not happened *yet*. (Doc. 18 at 22 (citing *Ladak v. Noem*, No. 25-194, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025).) The regulations command that the interview happen "promptly . . . to afford the [noncitizen] an opportunity" to challenge the re-detention. 8 C.F.R. § 241.13(i)(3). The purpose is not served if petitioners can be held for months before the "prompt" interview happens.

used to correct mere irregularities" like the ones alleged here—i.e., violations of "mere administrative regulations, not required as a result of the Constitution." (Doc. 18 at 23.)  And because Respondents claim ICE's revocation regulations are "mere[ly] administrative," they insist that Petitioners must show "substantial prejudice to state a procedural due process claim." (*Id.* at 18, 23.) They suggest that Petitioners have made no showing of prejudice. And even if they had, Respondents argue Petitioners' habeas claims would still fail for one simple reason: they have not alleged a constitutionally protected right. (*Id.* at 23.) More specifically, Petitioners have "not explain[ed] how they had any constitutional right to notice and an informal interview." (*Id.*) The Court does not agree.

In *United States v. Accardi*, the Supreme Court held that when the Government promulgates regulations "with the force and effect of law," agencies are bound to follow their own "existing valid regulations." 347 U.S. 260, 265, 268 (1954). As Respondents suggest, to prove an *Accardi* claim, and therefore a due process violation, the petitioner must ordinarily demonstrate prejudice resulting from the violation. *See Am. Farm Liens v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970). However, prejudice may be presumed when "compliance with the regulation is mandated by the Constitution" and "where an entire procedural framework, designed to ensure the fair processing of an action affecting an individual is created but then not followed by an agency." *Delgado-Corea v. Immigr. & Naturalization Serv.*, 804 F.2d 261, 263 (4th Cir. 1986); *see also Villanueva*, 801 F. Supp. 3d at 698–99 ("The statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to detainees."); *Gurung v. Warden, S. Tex. ICE Processing Ctr.*, No. 25-1614, 2026 WL 93145, at *8 (W.D. Tex. Jan. 6, 2026) ("The regulations enacted by the government itself are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked. By failing to follow its

own regulations, the government has denied Petitioner notice . . . and an opportunity to challenge those reasons. . . . Again, the government can have no legitimate interest in ignoring its own regulations, which are intended to ensure that the discretion afforded to the government's agents is not exercised arbitrarily.").

Multiple courts within this circuit and throughout the country, being faced with fact patterns nearly identical to Petitioners', have considered the regulations discussed above and found:

> [T]hese regulations are intended to provide due process in that they are fairly construed to be part of a procedural framework designed to ensure the fair processing of an action affecting an individual, such that when they are not followed, <u>prejudice is presumed</u>."

*Santamaria Orellana v. Baker*, No. 25-1788, 2025 WL 2444087, at *6 (D. Md. Aug. 25, 2025) (emphasis added); *see also Bonitto v. Bureau of Immigr. & Customs Enf't*, 547 F. Supp. 2d 747, 755–56 (S.D. Tex. 2008) ("Where individual interests are implicated, the Due Process clause requires that an executive agency adhere to the standards by which it professes its action to be judged. The regulations involved here [(8 C.F.R. §§ 241.4, 241.13)] do not merely facilitate internal agency housekeeping, but rather afford important and imperative procedural safeguards to detainees. This Court must insist on DHS's compliance with the post-order custody regulations" for detention to be considered constitutional.); *Misirbekov v. Venegas*, 796 F. Supp. 3d 436, 439–40 (S.D. Tex. 2025) ("The review process contemplated by the regulations [(8 C.F.R. § 241.4)] is a meaningful individualized review, as the interest involved is the most elemental of liberty interests—the interest in being free from physical detention. The record shows that Petitioner has not been afforded this process." For that reason, the court ordered the non-citizens' release from detention.); *Villanueva*, 801 F. Supp. 3d at 698–99 ("The statutes and regulations governing immigration and removal proceedings afford important procedural safeguards to detainees. For

Villanueva's detention to be constitutional, the government must have complied with both the applicable statutory provisions and its own regulations."); *Gurung*, 2026 WL 93145, at *4, *8 (The "mandatory" procedural regulations "enacted by the government itself are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked." ICE's noncompliance has "denied Petitioner notice of its intent to revoke his supervision, notice of the reasons for the revocation, and an opportunity to challenge those reasons. . . . Again, the government can have no legitimate interest in ignoring its own regulations, which are intended to ensure that the discretion afforded to the government's agents is not exercised arbitrarily."); *Rombot v. Souza*, 296 F. Supp. 3d 383, 389 (D. Mass. 2017) (As described above, ICE failed to follow its own [mandatory procedural] regulations in at least three ways. The Supreme Court has recognized that an "alien may no doubt be returned to custody upon a violation of supervision conditions, but it has never given ICE a carte blanche to re-incarcerate someone without basic due process protection." (internal citations omitted)); *Primero v. Mattivelo*, No. 25-11442, 2025 WL 1899115, at *5 (D. Mass. July 9, 2025) ("DHS's detailed regulations provide for custody determinations to be made where an individual is detained beyond the removal period. A decision to retain custody beyond the removal period must briefly set forth the reasons for the continued detention. Petitioner is constitutionally entitled to this process."); *Sanchez v. Bondi*, No. 25-2573, 2026 WL 160882, at *5 (W.D. Wash. Jan. 21, 2026) ("The re-detention of a noncitizen subject to a final order of removal is governed by 8 C.F.R. § 241.13. The regulation was intended to provide due process protections to noncitizens following the removal period as they are considered for continued detention, release, and then possible revocation of release." (internal citations omitted)); *M.Q. v. United States*, 776 F. Supp. 3d 180, 187, 190 & n.1 (S.D.N.Y. 2025) (holding that 8 C.F.R. § 241.4(l) required ICE to provide petitioner, who had not violated

conditions of release, with notice and an informal interview); *Constantinovici v. Bondi*, — F. Supp. 3d —, 2025 WL 2898985, at *5 (S.D. Cal. Oct. 10, 2025) ("The Government has significant discretion to enforce the immigration laws and . . . to revoke an Order of Supervision. However, the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process."); *Nazarian v. Noem*, No. 25-2694, 2025 WL 3236209, at *4, *5 (C.D. Cal. Nov. 3, 2025) (agreeing with petitioner that "revocation of his release and subsequent re-detention violate[d] ICE's own regulations and, thereby, the Due Process Clause"; and explaining: "Even if Section 241.4 grants certain officials broad discretion over revocation, the regulation still requires ICE to provide Petitioner notice and an interview. Respondents offer no authority to suggest ICE may simply ignore Section 241.4's procedural safeguards in discretionary revocations."); *Delkash v. Noem*, No. 25-1675, 2025 WL 2683988, at *6 (C.D. Cal. Aug. 28, 2025) ("These procedures are not optional or discretionary; they must be followed, and failure to do so renders the detention unlawful."); *Perez-Escobar v. Moniz*, 792 F. Supp. 3d 224, 226 (D. Mass. 2025) ("ICE's failure to give Petitioner meaningful notice of the basis for its revocation of his release violated the regulation and due process."); *Nguyen v. Lyons*, No. 25-631, 2026 WL 125093, at * 4 (D.R.I. Jan. 16, 2026) ("[T]he government is not free to ignore their own regulations or the Fifth Amendment due process protections in order to re-detain Mr. Nguyen while they are simply waiting for 'ICE to determine whether a travel document is approved.' . . . Respondents have re-detained Mr. Nguyen in violation of 8 C.F.R. § 241.13(i)(2) . . . . ICE's own immigration regulation was promulgated to protect a fundamental right derived from the Constitution."); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 149, 150 (W.D.N.Y. 2025) ("The new administration is free to shift policies and change course. But that does not mean it can do so without complying with the law and due process. . . . And as Mata Velasquez observes, while the new administration may wish

to change course, his engendered reliance interest, and his compliance with everything that the Executive Branch asked of him, entitles him to more than summary arrest and detention 'on the mere say-so of a government official.'").

And so, courts have overwhelmingly ruled that the revocation regulations provide important procedural safeguards and are intended to protect a fundamental right derived from the constitution—liberty. The Court finds these cases persuasive and agrees with their holdings. Even still, we must address the cases compiled by Respondents, and offered as a "[]complete statement of the law in the Fifth Circuit." (Doc. 18 at 18.)

Respondents cite to several cases as support for their argument that "[i]n the Fifth Circuit, Petitioners are required to establish substantial prejudice to state a procedural due process claim." (*Id.*) The Court has thoroughly examined each of the cases discussed in Respondents' filings and finds them unpersuasive. In the overwhelming majority, the petitioner is asking the court to invalidate a final order of the Board of Immigration Appeals based on an alleged violation of the regulations applicable to administrative adjudications before an immigration judge or the Board of Immigration Appeals. *See Molina v. Sewell*, 983 F.2d 676, 678 (5th Cir. 1993) (In BIA proceedings, "Lozano had not been advised of his right to present evidence or object to the Government's evidence. . . . To prove that administrative proceedings should be invalidated for violation of regulations, an alien must show substantial prejudice."); *Ka Fung Chan v. INS*, 634 F.2d 248, 258 (5th Cir. 1981) ("Chan . . . contends that the immigration judge at his deportation proceeding violated due process when he denied Chan's request for a continuance. Second, he argues that the immigration judge . . . violated due process when he engaged in ex parte communications with a deportation officer. . . . [E]ach of these due process attacks fails because proof of a denial of due process in an administrative proceeding requires a showing of substantial prejudice."); *Retana*

*Leyva v. Barr*, 838 F. App'x 13, 18 (5th Cir. 2020) (noncitizen claimed he was improperly served with NTA in connection with hearings before IJ and BIA, which violated hearing regulation; "We affirm the BIA on the grounds discussed below, namely, that Retana has not demonstrated that he was prejudiced by the defective service."); *Osorio Diaz v. Barr*, 831 F. App'x 718, 719 (5th Cir. 2020) (same); *Ayala Chapa v. Bondi*, 132 F.4th 796, 799–800 (5th Cir. 2025) (seeking review of BIA order; court found no violation of statute or regulations where a reappointed temporary Board member issued BIA order); *Francois v. Garland,* 120 F.4th 459, 464 (5th Cir. 2024) (seeking review of decision by BIA where it applied an incorrect standard of review when considering the IJ's decision on appeal; "because the BIA's standard of review is not compelled by the Constitution or statute," petitioner must show substantial prejudice—i.e., that violation affected outcome of proceedings). In the cases cited above, the petitioner is not alleging unlawful, unexpected, and presumably indefinite, re-detention by ICE, nor do they seek release from re-detention.

The immigration habeas cases relied on and discussed by Respondents come from the Northern District of Texas[17]—*Nguyen v. Noem*, 797 F. Supp. 3d 651 (N.D. Tex. 2025), *Surovtsev*

---

[17] Respondents repeatedly cite, and indeed take the time to analyze and discuss, the Northern District of Texas cases, on which the gravamen of their argument is based—*Nguyen v. Noem*, 797 F. Supp. 3d 651 (N.D. Tex. 2025), *Surovtsev v. Noem*, No. 25-160, 2025 WL 3264479 (N.D. Tex. Oct. 31, 2025), *Ladak v. Noem*, — F. Supp. 3d —, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025), and *Nouansisouhak v. Noem*, No. 25-2222, 2025 WL 3165161 (N.D. Tex. Oct. 9, 2025. (Doc. 18 at 18.)

While Respondents do cite a few other immigration habeas cases, they do not provide any discussion. (Doc. 18 at 22, 23.) Having read these other cases as well, the Court is not persuaded. *See, e.g.*, *Doe v. Smith*, No. 18-11363, 2018 WL 4696748, at *9 (D. Mass. Oct. 1, 2018) (case decided under very different circumstances—Uganda confirmed it would issue travel document but only *after* petitioner was returned to ICE custody; upon re-detention, petitioner given notice of revocation, reasons were explained and informal interview conducted, all on the day of re-detention; second interview conducted 4 weeks later; parties disputed whether first or second interview counted for purposes of regulation; when read in context, quoted language—"no apparent reason why a violation, even assuming it occurred, should result in release"—does not support Respondents' position considering Doe's removal was truly imminent); *Ahmad v. Whitaker*, No. 18-287, 2018 WL 6928540, at *5 (W.D. Wash. Dec. 4, 2018) (acknowledging ICE failed to provide the informal interview, but that failure alone did not warrant habeas relief where petitioner seems to have not allege lack of interview in connection with due process claim; and habeas relief not warranted "given that ICE had procured a travel document and scheduled Mr. Ahmad's removal" before his re-detention, and considering the purpose of the interview is so the "noncitizen may present information showing that there is no significant likelihood of removal in the reasonably foreseeable future"); *Umanzor-Chavez v. Noem*, No. 25-1634, 2025 WL 2467640, at *5 n.4

*v. Noem*, No. 25-160, 2025 WL 3264479 (N.D. Tex. Oct. 31, 2025), *Ladak v. Noem*, — F. Supp. 3d —, 2025 WL 3764016, at *5 (N.D. Tex. Dec. 30, 2025), and *Nouansisouhak v. Noem*, No. 25-2222, 2025 WL 3165161 (N.D. Tex. Oct. 9, 2025).

Citing these opinions, Respondents suggest that "several district courts," (Doc. 18 at 20), have found that the harmless error/substantial prejudice standard applies under facts similar to those alleged by Petitioners. But we disagree where each case not only came out of a single district court—the Northern District of Texas—each opinion is virtually a carbon copy of the others. In other words, four different courts considering similar issues did not reach the conclusion advocated by the government. Rather, a single court copy-and-pasted the same opinion four times. And so, in reality, one court supports the government's position. *See Nguyen*, 797 F. Supp. 3d at 664 ("A violation of Section 241.13(i)(3) alone cannot justify habeas. It is a mere administrative regulation, not required as the result of the Constitution."). For simplicity, the Court refers to *Nguyen v. Noem* as representative of the four Northern District of Texas cases.

*Nguyen* represents a hyper-minority. It unpersuasively relies on either 'criminal' habeas cases or immigration cases that do not deal with detention or habeas. For example, *Nguyen* relies on *Jalloh v. Garland*, No. 20-2117, 2023 WL 1859918, at *2 (4th Cir. 2023), and *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004), for the proposition that "Harmless error applies in immigration cases generally." *Nguyen*, 797 F. Supp. 3d at 662. But both *Jalloh* and *Ngarurih* concern judicial review of decisions by the Board of Immigration Appeals. They do not concern immigration detention or habeas relief. In other words, they are wholly inapplicable to the issues presented in both *Nguyen* and the case at hand. *See also Nguyen*, 797 F. Supp. 3d at 664 ("The

---

(D. Md. Aug. 27, 2025) (in a footnote, court questions whether regulation requiring informal interview even applies to petitioner's situation; alternatively, if regulation does apply, court finds without any analysis that failure to conduct the interview is not, by itself, enough to warrant relief).

Fifth Circuit has confirmed in other contexts that the failure of officials 'to follow their own policies, without more, does not constitute a violation of due process,' making a writ of habeas corpus generally not available." (quoting *Iruegas-Maciel v. Dobre*, 67 F. App'x 253, 253 (5th Cir. 2003) (a single-paragraph opinion affirming dismissal of an inmate's habeas petition that claimed "he was denied due process in connection with his disciplinary hearing")). Considering the overwhelming majority of district courts in the Fifth Circuit and throughout the country have reached the opposite conclusion, the Court is not persuaded by *Nguyen*.

Instead, we join the majority of courts throughout the country and find that ICE's regulations—8 C.F.R. §§ 241.4, 241.13—mandate important procedural safeguards against wrongful detention. This conclusion is especially warranted considering the re-detention of a noncitizen following supervised release deprives them of personal liberty. *See Villanueva*, 801 F. Supp. 3d at 704 ("[E]ven if the government has the discretion to revoke [Petitioners'] supervision, [their] constitutionally protected liberty interests are implicated by [their] re-detention.").

"The Fifth Amendment's Due Process Clause forbids the Government to deprive any person of liberty without due process of law. Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. What's more, individuals who have been conditionally released from detention have a protected interest in their "continued liberty." *Young v. Harper*, 520 U.S. 143, 147 (1997). This is true even when the released individual is subject to extensive conditions of release. *Villanueva*, 801 F. Supp. 3d at 704.

With that in mind, this Court now joins the multitude of courts within the Fifth Circuit and across the country recognizing that non-citizens have an "overwhelming liberty interest" in their "continued release under [an] Order of Supervision . . . that may not be removed without due

process." *Gurung*, 2026 WL 93145, at *8 ("Petitioner has a liberty interest in his continued release under his Order of Supervision. He was free under that Order for over two years. He has a job and a family. He has complied with all of the terms of his Order of Supervision. . . . There is no principled reason to find that [Petitioner] does not have an overwhelming liberty interest in his continued release that may not be removed without due process."); *see also Villanueva*, 801 F. Supp. 3d at 704 ("Here, even if the government has the discretion to revoke Villanueva's supervision, his constitutionally protected liberty interests are implicated by his re-detention."); *Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 686 (W.D. Tex. 2025) ("[O]nce released from immigration custody, noncitizens acquire a protectable liberty interest in remaining out of custody . . . ."); *Trejo v. Warden of ERO El Paso E. Montana*, —F. Supp. 3d—, 2025 WL 2992187, at *7 (W.D. Tex. Oct. 24, 2025) ("Many courts, including this one, have found that ICE's decision to release a noncitizen confers a significant liberty interest that cannot be revoked without an individualized determination by a neutral adjudicator."); *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025) ("Petitioner's actions since his initial release" from ICE detention "show that he has not only reasonably relied on this [liberty] interest, but that the interest is weighty. Upon being released, Petitioner reunited with his family, whom he supported as the "primary breadwinner" and "[h]e and his partner had their first child together, who is a citizen of the United States. He successfully and timely filed for asylum. These actions were only made possible by Petitioner's freedom, which is the most elemental of liberty interests."); *Iza v. Arnott*, No. 25-3392, 2026 WL 67152, at *3 (W.D. Mo. Jan. 8, 2026) ("When the government grants an alien parole into the country, it creates a liberty interest intimately tied to freedom from imprisonment.").

Indeed, the Western District of Texas has even recognized that noncitizens like Petitioners—i.e., those previously released on an OSUP but now re-detained—enjoy a "liberty interest [that] is stronger than the usual *Zadvydas* petitioner, who is detained continuously from the time of their final removal order." *Trejo*, — F. Supp. 3d —, 2025 WL 2992187, at *6 ("After his removal order was reinstated, Trejo was released pursuant to an OSUP and lived at liberty in the United States for nearly six and a half years. Thus, in the alternative, the Court finds that Trejo is entitled to additional procedural protections by virtue of the liberty interest he obtained through his release.").

The Court is persuaded by *Trejo*, and the cases cited above, and finds Petitioners had an overwhelming liberty interest in their continued supervised release that was entitled to due process protections. ICE's failure to follow its own mandatory regulations (or otherwise afford Petitioners any meaningful notice or opportunity to be heard) in revoking supervised release was per se prejudicial. For these reasons, Petitioners are entitled to habeas relief and immediate release from detention.

### B.    Continued Detention Under *Zadvydas*

Even if Petitioners' initial detentions were lawful, or if the related due process claims could be cured, they also challenge their ongoing detention under the *Zadvydas* doctrine, asserting that their deportation is not reasonably foreseeable and should be ended. In *Zadvydas*, the Supreme Court recognized that while the government may need more than the 90-day removal period to effect deportation, it cannot lawfully detain people indefinitely. *Zadvydas*, 533 U.S. at 697. Finding that detention longer than six months is constitutionally suspect, the court established that a period of up to six months is a presumptively reasonable time to detain people for the purpose of

effectuating removal; when removal is not reasonably foreseeable, detention is no longer lawful. *Id*. at 699, 701.

### 1. *Zadvydas* Period and Re-detention

Respondents argue that Petitioners' *Zadvydas* claims are premature because they have not been detained for longer than the 6-month presumptively reasonable period. But when calculated properly, each Petitioner's period of detention exceeds 6 months.

> As other courts have explained, a re-detention after release on an OSUP "is not your typical first round detainment of an alien awaiting removal." *Escalante v. Noem*, No. 25-CV-182, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025). When an immigrant "was previously detained, then released on supervised release, . . . his 90-day removal period has long expired." *See Balouch v. Bondi*, No. 25-CV-216, 2025 WL 2871914, at *2 (E.D. Tex. Oct. 9, 2025).

*Garcia-Aleman v. Thompson*, No. 25-886, 2025 WL 3534806, at *3 (W.D. Tex. Nov. 24, 2025), *report and recommendation adopted*, No. 25-886, 2025 WL 3532179 (W.D. Tex. Dec. 9, 2025). In a re-detention case, a petitioner's period of post-removal detention entails not only his current detention, but also his initial detention:

> At least four district courts around the country have held that the clock does not "start over" for purposes of *Zadvydas* if a person is re-detained. *See, e.g.*, *Villanueva v. Tate*, —— F.Supp.3d ——, ——, 2025 WL 2774610, at *9 (S.D. Tex. Sept. 26, 2025); *Nguyen v. Scott*, —— F.Supp.3d ——, ——, 2025 WL 2419288, at *13 (W.D. Wash. Aug. 21, 2025); *Sied v. Nielsen*, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018); *Chen v. Holder*, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015) ("Surely, under the reasoning of *Zadvydas*, a series of releases and re-detentions by the government, as was done in this case, while technically not in violation of the presumptively reasonable jurisprudential six month removal period, in essence results in an indefinite period of detention, albeit executed in successive six month intervals."). Three district courts have seemingly held the opposite. *See Guerra-Castro v. Parra*, 2025 WL 1984300, at *4 (S.D. Fla. July 17, 2025); *Thai v. Hyde*, 788 F.Supp.3d 57, 60-61 (D. Mass. 2025); *Meskini v. Att'y Gen. of United States*, 2018 WL 1321576 (M.D. Ga. Mar. 14, 2018). This Court, however, is persuaded by the reasoning in *Chen* and is disinclined to allow such gamesmanship by the government. *See also Villanueva*, —— F.Supp.3d at ——, 2025 WL 2774610, at *9 (coming to a similar conclusion).

*Jimenez Chacon v. Lyons*, No. 25-977, 2025 WL 3496702, at *7 (D.N.M. Dec. 4, 2025) (citations unaltered); *see also Aguilar v. Noem*, No. 25-3463, 2025 WL 3514282, at *3 (D. Colo. Dec. 8, 2025) (collecting cases); *Abuelhawa*, 2025 WL 2937692, at *4 (collecting cases) ("Most courts to consider the issue have concluded that the *Zadvydas* period is cumulative, motivated by a concern that the federal government could otherwise detain aliens indefinitely by continuously releasing and re-detaining them.").[18] This Court agrees: To consider only the current period of detention would be to allow the Government to indefinitely detain noncitizens through successive detentions, at direct odds with *Zadvydas*'s protection against indefinite detention. *See Chen*, 2015 WL 13236635 at *2 ("[T]he danger sought to be addressed by *Zadvydas* was 'indefinite detention' of aliens."). And so, because Petitioners' current periods of detention combine with their previous detentions for the purposes of *Zadvydas*, Petitioners' claims are not premature.[19]

### 2. Presumption of Reasonableness is Rebuttable

Even if the *Zadvydas* period started over with each instance of detention and the analysis here were limited only to the current period of detention, Petitioners would still have a valid *Zadvydas* claim. Respondents argue that Petitioners' *Zadvydas* claims are premature because they were detained for less than six months at the time of filing, but "nothing in *Zadvydas* precludes a challenge to detention before the presumptive[ ] . . . period has elapsed." *Villanueva*, 801 F. Supp. 3d at 702; *see Puertas-Mendoza v. Bondi*, No. 25-890, 2025 WL 3142089, at *2 (W.D. Tex. Oct.

---

[18] This conclusion is also consistent with the purpose of the *Zadvydas* presumptive period: to allow the government leeway to continue detaining noncitizens while processing their deportation. If a noncitizen has been released on an OSUP for 30 years and re-detained in order to effectuate removal, the government has had 30 years of opportunity to lay the groundwork for that removal. (*See* Doc. 26 at 27–28 ("[Judge]: When one of these noncitizens is [released] under OSUP, ICE continues to try to deport him. Right? . . . [Respondents]: That's correct.").)

[19] Rodriguez Romero, was detained on August 6, 2025—over 4 months before the Petition was filed, with an initial post-removal detention of over two years. (Doc. 1 at 13; Doc. 18-3 at 2.) Mohammed was detained on July 17, 2025 (almost 5 months), with initial period of almost three months. (Doc. 1 at 25.) Blanco Chomat was detained on June 25, 2025 (5.5 months), with initial period of over 3 months. (Doc. 18-4 at 2.) And Gaston Sanchez was detained on June 25, 2025 (5.5 months) with initial period of nearly 4 months. (Doc. 18-1 at 3.)

22, 2025) ("*Zadvydas* recognized a presumptively—not categorically—reasonable period of detention.") (citation modified); *see also Zavvar v. Scott*, No. 25-2104, 2025 WL 2592543 (D. Md. Sept. 8, 2025), at \*5–6 (collecting cases). The presumption was a "guide" for lower court determinations of whether removal is reasonably foreseeable. *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 397 (D.N.J. June 24, 2025) (quoting *Zadvydas*, 533 U.S. at 700–01). And *Zadvydas* unequivocally held that "once removal is no longer reasonably foreseeable, continued detention is no longer authorized." *Zadvydas*, 533 U.S. at 699.

Some courts have assumed that the six-month presumption precludes a challenge to detention before that time elapses. *Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 374 (D. Md. Aug. 11, 2025) (collecting cases); *see also Chance v. Napolitano*, 453 F. App'x 535, 536 (5th Cir. 2011) (per curiam) (non-precedential opinion denying IFP on appeal and, in the process, affirming a district court's finding that a challenge to post-removal detention was premature because "Chance had not been in post-removal-order detention longer than the presumptively reasonable six-month period," but the underlying district court order had held that the petition was premature because the 90-day removal period and thus the six-month presumptive period had not yet *begun* (*Chance v. Napolitano*, No. 10-596, ECF No. 9 at 2 (W.D. Tex. Sept. 2, 2010))); *Agyei-Kodie v. Holder*, 418 F. App'x 317, 318 (5th Cir. 2011) (per curiam) (denial of IFP on appeal, concluding without discussion that petitioner's claim was premature, and citing only *Zadvydas* itself).

*Zadvydas*'s creation of a presumption rather than a conclusive bar (*see Cruz Medina*, 794 F. Supp. 3d at 375) and the case's actual rule—"if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute"—militate against that understanding. *See Zadvydas*, 533 U.S. at 699–700.

This six-month presumption is not a bright line, however, and *Zadvydas* did not automatically authorize all detention until it reaches constitutional limits. *See Clark*,

29

> 543 U.S. at 384; *see also* Ian Bratlie & Adriana Lafaille, *A 180-Day Free Pass? Zadvydas and Post-Order Detention Challenges Brought Before the Six-Month Mark*, 30 Geo. Immigr. L.J. 213, 239 (2016) (noting that six-month presumption is not an element of authorizing statute, but rather, an aid to courts; allowing a six-month bright line rule would give government authority beyond the statute to arbitrarily detain without judicial review for six months). Rather, habeas courts have the duty to ask whether detention has "exceed[ed] a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 699–700. Where removal is not reasonably foreseeable, "the court should hold continued detention unreasonable and no longer authorized by statute," and release the petitioner under appropriate supervised conditions. *Id*. at 700.

*Ali v. Dep't of Homeland Sec*., 451 F. Supp. 3d 703, 707 (S.D. Tex. 2020). "Even within the presumptively constitutional detention period, whether a noncitizen's detention is constitutional hinges on whether his removal from the United States is reasonably likely in the foreseeable future, not on how long the noncitizen has been detained." *Villanueva*, 801 F. Supp. 3d at 703. And so, Petitioners could challenge their detention as unconstitutional even if their detention period were less than 6 months.

## 2. Likelihood of Removal in the Reasonably Foreseeable Future

Having established that Petitioners' *Zadvydas* claims are properly brought, the Court now turns to the substantive question: Is there a significant likelihood of Petitioners' deportation in the reasonably foreseeable future? In a *Zadvydas* analysis, it is Petitioners' burden to show that there is good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future; in order to continue detaining Petitioners, the Government must show evidence sufficient to rebut Petitioners' showing. *Zadvydas*, 533 U.S. at 701.

Each Petitioner has a diplomatic barrier to removal to their home country: U.S. relations with Cuba prevent the Cuban Petitioners from being deported there, and Mohammed has CAT protection from removal to his native Ethiopia. (Doc. 1 at 9.) At the time of filing, the Cuban Petitioners also showed that Mexico would not accept deportees over the age of 60, meaning their

removal to Mexico would be impossible,[20] and Mohammed asserted that he had already been rejected by the countries listed as potential targets for his deportation. (*Id.* at 19, 26.) These assertions are good reason to believe Petitioners are not likely to be removed in the reasonably foreseeable future.

Attempting to rebut these claims, Respondents assert that Mexico has begun accepting deportees over the age of 60; as to Mohammed, Respondents assert that there are ongoing efforts to deport him to Canada. (Doc. 18 at 3.) In ordering that Respondents respond to the Petition, the Court ordered that such a response should include "any evidence which supports their position." (Doc. 17 at 2.) Regarding Petitioners' likelihood of deportation in the near future, Respondents put forth declarations by AFOD Prudhome;[21] these declarations are the only evidence in the record of ICE's efforts to deport Petitioners.[22] Regarding ICE's efforts to deport the Cuban Petitioners, the declarations provide the following information.[23]

**Gaston Sanchez** was ordered removed from the United States on September 24, 2001. From that time through January 18, 2002, ICE was unable to deport him, and so released him on an OSUP. He was convicted of a crime on May 3, 2005, and was released from prison on November 13, 2023, at which time ICE resumed custody. He was re-detained on June 25, 2025. ICE attempted to deport him to Mexico on October 23, 2025, but Mexico denied his entry because he was over the age of 60. On December 10, 2025, ICE learned that Mexico is accepting third

---

[20] And Respondents had not and still have not identified any other viable country for these Petitioners.

[21] The Court notes that while this declaration is "based upon knowledge and information obtained from various records and systems maintained by DHA in the regular course of business," there is no indication that Prudhome has firsthand knowledge of Petitioners' cases. (Docs. 18-1 at 1; 18-3 at 1; 18-4 at 1, 18-5 at 1.)

[22] Respondents' evidence also includes the Notices of Revocation for Blanco Chomat and Rodriguez Romero, Notices of Removal for Blanco Chomat and Mohammed, and an ICE internal document regarding delegation of signature authority.

[23] In the following paragraphs, the Court summarizes the Prudhome declarations: Declaration and Supplemental Declaration as to Gaston Sanchez at Docs. 18-1 and 18-2; Rodriguez Romero, Doc. 18-3; Blanco Chomat, Doc. 18-4. The Declaration as to Mohammed (Doc. 18-5) is summarized separately below.

country removals of people over the age of 60, and so "it is likely that the petitioner could be removed to Mexico in the near future." (Docs. 18-1, 18-2.)

**Rodriguez Romero** was ordered removed on May 30, 1995. He was issued OSUPs in September 2004 and June 2013. He was re-detained on August 6, 2025. On December 10, 2025, ICE learned that Mexico is accepting third country removals of people over the age of 60, and so "it is likely that Petitioner could be removed to Mexico in the near future." (Doc. 18-3.)

**Blanco Chomat** was ordered removed on September 20, 2001. He "came into ICE custody" on February 24, 2004, and was released on an OSUP on June 11, 2004. On October 23, 2025, ICE issued a Notice of Removal stating its intent to deport Blanco Chomat to Mexico, but Mexico denied his entry on November 18, 2025, because he was over 60 years old. On November 21, 2025, ICE learned that Cuba declined to accept him. On December 10, 2025, ICE learned that Mexico is accepting third country removals of people over the age of 60, and so "it is likely that the petitioner could be removed to Mexico in the near future." (Doc. 18-4.)

While Respondents assert that Mexico has reversed its policy and is now accepting deportees over the age of 60, they clarified for the Court that the policy of refusing deportees over 60 was only in place for about a month, several months *after* Petitioners were detained—that is, Respondents had custody of Petitioners for months before the policy was implemented and failed to remove Petitioners in that time. (Doc. 26 at 31.) It is clear that there is no individualized acceptance to Mexico for the Cuban Petitioners—and Respondents affirmed as much at oral argument. (Doc. 26 at 23–32.) There are no travel documents, there is no evidence of any informal acceptance, no suggestion that Mexico regularly accepts similarly situated deportees, or even

evidence that Respondents have made any affirmative steps toward obtaining travel documents for these Petitioners.[24]

In contrast to Respondents' lack of affirmative evidence of Petitioners' acceptance to Mexico, Petitioners have put forth evidence that "people who have medical issues, disabilities, or are in wheelchairs would not be accepted." (Doc. 20-3 at 4.) This disqualifies at least Rodriguez Romero, and possibly other Petitioners,[25] and Respondents have made no attempt to rebut this assertion. This possibility of rejection on other grounds demonstrates that the withdrawal of the ban on deportees over 60 was the removal of only one impediment to deportation—it does not speak to the existence of other impediments. And Respondents have not cured this logical error. When pressed at least nine separate times during oral argument for any evidence that Mexico would affirmatively accept these Cuban Petitioners, Respondents cited only the Prudhome declarations and their speculation that the Cuban Petitioners could possibly be removed to Mexico.[26] (Doc. 26 at 23, 24, 25, 29, 31.) Respondents also pointed to the fact that Petitioner Gaston Sanchez had been moved to the Mexican border for deportation but was turned away because of the 60+ ban. (*Id.* at 31.) But the fact that Gaston Sanchez was brought all the way to the border does not show that these Petitioners are likely to be removed to Mexico; instead, it only shows a likelihood of unsuccessful removal attempts. (*See id.* at 13.) Finally, there is evidence in the record that deportation to Mexico will "take a long time" because Mexico must individually accept each person on a "long list" of deportees. (Doc. 20-3 at 5.) The Court cannot find on the

---

[24] At oral argument, Respondents asserted that they have not taken affirmative steps toward removal to Mexico since December 12, 2025, "in respect of the Court's order" staying removal from this District while the Motion for Temporary Restraining Order is pending. (Doc. 26 at 25; Doc. 12.) To be clear, the Court's order does not prevent ICE from communicating with a target country or arranging for travel documents; and in any case, this misunderstanding only affects Respondents' efforts *after* the order was issued.

[25] The Court is not privy to the exact policy regarding which disabilities would disqualify a deportee.

[26] To be clear, the Court does not discredit the Prudhome declarations, but rather finds that they contain only speculative and conclusory statements as to the possibility of Petitioners' deportations.

evidence presented that there is a *significant likelihood* of the Cuban Petitioners' removal from the United States in the *reasonably foreseeable future*; therefore, Respondents have failed to rebut Petitioners' *Zadvydas* assertion that removal is unlikely.

The Prudhome declaration as to Petitioner Mohammed asserts that ICE continues to make efforts to deport him: **Mohammed** was ordered removed on November 18, 2018. On February 8, 2023, he reopened his case in order to pursue deferral under the Convention Against Torture ("CAT"). In March 2023, he was issued an OSUP and released. On June 14, 2023, he was re-detained because ICE had obtained a travel document to deport him to Ethiopia. Removal was deferred, and his CAT protection became final on September 5, 2024. ICE then attempted to deport him to a third country,[27] but entry was denied to Australia, France, Germany, and Canada; he was released on an OSUP on November 26, 2024. He was re-detained on July 17, 2025, for the purposes of deportation to Canada. He was transferred to Angola on September 2, 2025, and ICE "continues to work to process Petitioner for removal to a third country." On December 7, 2025, the local ICE office "followed up with ICE's headquarters component about ongoing efforts to remove Petitioner to Canada." (Doc. 18-5.)

Respondents have provided no explanation of ICE's plan to deport Mohammed to Canada despite Canada's rejection less than a year earlier. The only indication of any ongoing effort at deportation is the local ICE office's seemingly unanswered "follow-up" with ICE headquarters regarding removal to Canada. (Doc. 18-5 at 3.) This statement of vague efforts is not sufficient to rebut Mohammed's *Zadvydas* assertion that his removal is not significantly likely to occur in the reasonably foreseeable future.

---

[27] "Third country" here meaning a country other than the United States or the petitioner's home country.

Finally, as a general argument, Respondents cited previous unsuccessful removals as evidence that attempts are being made to remove Petitioners. (Doc. 26 at 31–32 ("[Respondents]: Petitioner Sanchez was at the border ready to be removed to Mexico. . . . Petitioner Mohammed received travel documents for Ethiopia and then sought CAT protection. . . . [M]y greater point is ICE has made attempts to effectuate these [] Petitioners' removals in the past.").) But "continued efforts" or good faith efforts are not enough; *Zadvydas* itself rejected this idea. There, the Supreme Court found that the Fifth Circuit's holding that "continued detention [was] lawful as long as 'good faith efforts to effectuate . . . deportation continue'" would require a noncitizen to show that removal is impossible—"which demands more than our reading of the statute can bear." *Zadvydas*, 533 U.S. at 702.

Even if continued efforts at removal could show a likelihood of removal, "third-country removals are not quick, and even when they are successful, they're taking a while." *Garcia-Aleman*, 2025 WL 3534806 at *5, *report and recommendation adopted*, No. 25-886, 2025 WL 3532179 (W.D. Tex. Dec. 9, 2025) (internal quotation omitted); *see also* Doc. 20-3 at 5 (deportation to Mexico will "take time because there was a long list [to work] through, and Mexico ha[s] to approve each person individually," and "it would take a long time [] to go through that process for each person"). "And that is not simply a matter of United States policy—foreign governments routinely deny requests to receive people who lack a connection to the would-be receiving country." *Puertas-Mendoza*, 2025 WL 3142089, at *3 (citation modified). Even with the intent to remove Petitioners to third countries, Respondents cannot give an estimated time for removal. The mere possibility of removal does not demonstrate a significant likelihood of removal. *See Balouch v. Bondi*, No. 25-216, 2025 WL 2871914, at *3 (E.D. Tex. Oct. 9, 2025) (finding that the "potential for another removal flight" in 1–2 weeks, when petitioner is not scheduled to be on that flight,

does not meet the Government's burden); *see also Kane v. Mukasey*, No. 8-37, 2008 WL 11393137, at *5 (S.D. Tex. Aug. 21, 2008), *superseded by*, 2008 WL 11393094 (S.D. Tex. Sept. 12, 2008) (a new report and recommendation was entered denying the petition as moot because petitioner was deported prior to the order adopting), *report and recommendation adopted*, 2008 WL 11393148 (S.D. Tex. Oct. 7, 2008) ("A remote possibility of an eventual removal is not analogous to a significant likelihood that removal will occur in the reasonably foreseeable future."). Respondents' reference to the mere possibility of deportation further supports the Court's conclusion that Respondents have not made a showing to rebut Petitioners' *Zadvydas* claim that their removal is not significantly likely in the reasonably foreseeable future.

### C.    Relief

As discussed above, Petitioners are currently detained in violation of their constitutional rights. Further, they have been detained with no opportunity to arrange for care for their dependents, pets, or homes; the Court can only assume that bills have gone unpaid, jobs may have been lost, and Petitioners may be released into housing and food instability, all because the Government unlawfully detained them. Petitioners suffer additional irreparable harm every day they remain in custody. *See Nazarian v. Noem*, No. 25-2694, 2025 WL 3236209, at *6 (C.D. Cal. Nov. 3, 2025).

> As a remedy, courts across the country have ordered the release of individuals stemming from ICE's illegal detention. *Roble v. Bondi*, 2025 WL 2443453, at *5 (D. Minn. Aug. 25, 2025) (ordering petitioner's "release from custody as a remedy for ICE's illegal re-detention"); *Nguyen v. Hyde*, 2025 WL 1725791, at *5 (D. Mass. June 20, 2025) (holding that because ICE violated "its own regulations... [petitioner's] detention is unlawful and that his release is appropriate"); *Rombot v. Souza*, 296 F.Supp. 3d 383, 389 (finding that because ICE's detention failed to follow due process, the court ordered release "pursuant to the conditions in [petitioner's] preexisting Order of Supervision.") The Supreme Court has recognized that "Habeas has traditionally been a means to secure release from unlawful detention." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (emphasis in original).

*K.E.O. v. Woosley*, No. 25-74, 2025 WL 2553394, at *7 (W.D. Ky. Sept. 4, 2025).

Respondents assert that habeas relief would not change the fact that Petitioners are removable and could be re-detained upon release from custody, that "a do-over in this case would be wasteful." (Doc. 18 at 22, n.71 (citation omitted).) Respondents are wrong. They may only re-detain Petitioners *lawfully*. This Court cannot allow Respondents to continue unlawfully detaining people in anticipation that they may someday do so lawfully. As Petitioners stated at oral argument, "Even if that concrete removal plan were put in place quite rapidly following release, release itself is still meaningful relief because it allows Petitioners to have their freedom, as is their right, until removal is actually imminent." (Doc. 26 at 7–8). The Court agrees.

## VI.    CONCLUSION

Having found that the Government has detained Petitioners unlawfully, this Court now joins the large and growing camp of sister courts in determining that habeas relief is appropriate when ICE has detained noncitizens in violation of their constitutional rights. And so,

**IT IS ORDERED** that Petitioners' Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED**. Respondents shall release Petitioners from their custody within 3 hours of this order, under the conditions of the previously revoked OSUPs.

**IT IS FURTHER ORDERED** that as soon as practicable, but no less than 2 hours prior to Petitioners' release, Respondents shall inform Petitioners' counsel of the time and location of Petitioners' release.

**IT IS FURTHER ORDERED** that Respondents shall not re-detain Petitioners without due process of law, in accordance with this Order.

Finally, **IT IS ORDERED** that the Motion for Temporary Restraining Order (Doc. 7) is **TERMINATED AS MOOT**.

Signed in Baton Rouge, Louisiana, on <u>February 6, 2026</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**