UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

FRANCISCO RODRIGUEZ ROMERO,
ET AL.

VERSUS

SCOTT LADWIG, ET AL.

CIVIL ACTION

NO. 25-1106-JWD-EWD

ORDER

Before the Court is *Petitioner's Emergency Motion to Enforce Order Granting Habeas Corpus Petition and Compel Release* ("*Motion to Enforce*") (Doc. 31), filed by Petitioner Ibrahim Mohammed ("Petitioner" or "Mohammed"). Petitioner seeks enforcement of this Court's February 6, 2026, *Ruling and Order* (Doc. 28) and corresponding *Judgment* (Doc. 29), by which the Court granted Petitioner habeas relief pursuant to 28 U.S.C. § 2241 and ordered his release from immigration detention. Counsel for Petitioner filed the instant motion on March 10, 2026—the morning after Petitioner was re-detained by Immigration and Customs Enforcement ("ICE"). (Doc. 31 at 1.) After learning that Petitioner was "on his way to the airport" for removal to a seemingly unknown third country, counsel also filed *Petitioner's Emergency Motion for a Temporary Restraining Order Pending His Emergency Motion to Enforce, Dkt. 31* ("*Motion for TRO*") (Doc. 34). After holding an impromptu Status Conference, the Court granted the *Motion for TRO*, preventing Petitioner's removal for a period of five days. (Doc. 36 at 7.)[1] The TRO was subsequently extended and is currently set to expire on April 21, 2026. (Doc. 71.)

---

[1] During the March 10 Status Conference held in response to the *Motion for TRO* (Doc. 34), Respondents "asserted the Court's lack of jurisdiction over removals, per the jurisdiction-stripping provision of 8 U.S.C. § 1252(g)." (*See* Doc. 36 at 2–5 (addressing Respondents' argument).) The Court, however, rejected Respondents' contention that 8 U.S.C. § 1252(g) stripped it of "jurisdiction to review Mr. Mohammed's removal to a third country" in its *Ruling and Order* (Doc. 36) granting the *Motion for TRO*. (*Id.* at 2–5.) In their pre-hearing brief, Respondents "reassert their position" that 8 U.S.C. § 1252(g) divests the Court of jurisdiction to "preserve their arguments for future review." (Doc. 37 at 7.) Respondents do not raise any new arguments concerning jurisdiction. And so, the Court incorporates by reference the analysis provided in its *Ruling and Order* granting the *Motion for TRO*. (*See* Doc. 36 at 2–5.) For those same reasons, the Court again determines that it has jurisdiction to hear Petitioner's claim, which "challenges

On March 12, 2026, Respondents Scott Ladwig, Todd Lyons, Kristi Noem, and Pamela Bondi (collectively, "Respondents" or "the Government")[2] filed a response to Petitioner's *Motion to Enforce*. (Doc. 37.) Due to the meaningful factual discrepancies between Petitioner's version of events and Respondents', (*compare* Doc. 31 *and* Doc. 38, *with* Doc. 37), the Court held an evidentiary hearing on March 25, 2026, (*see* Docs. 40, 66, 69). The Court has jurisdiction to decide the instant motion.[3] Having carefully considered the law, the facts in the record, and the arguments and submissions of the parties, the Court now grants Petitioner's *Motion to Enforce*, for the reasons that follow.

## I.    BACKGROUND

Petitioner is a 44-year-old citizen of Ethiopia, who lawfully entered the United States in 2014 and made his home in Maryland. (Doc. 46-5 at 14–16, 30.) After arriving in the United States, Petitioner was granted asylum and, in 2016, became a lawful permanent resident. (*Id.* at 30.) In

---

the process he has been afforded after the Government made [the] decision[] . . . to execute his removal order" to a third country. *See Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1005 (S.D. Tex. 2025) (rejecting similar argument where noncitizen alleged lack of due process in connection with third country removal); *see also Mbaba v. Perez*, No. 26-70, 2026 WL 917484, at *5 (S.D. Tex. Feb. 13, 2026) ("District courts have distinguished between challenges to ICE's discretion to execute a removal order, which are barred, and challenges to the manner in which ICE executes the removal order, which are not. Here, . . . Petitioner does not seek review of the discretionary decision to execute her removal order. Rather, she seeks review of the process due to her under the Fifth Amendment's Due Process Clause after that decision has been made. As a result, the Court's jurisdiction is not barred by section 1252(g)." (cleaned up)).

[2] As of March 24, 2026, Markwayne Mullin has replaced Kristi Noem as Secretary of the United States Department of Homeland Security. And as of April 2, 2026, Todd Blanche has assumed the role of Acting United States Attorney General, replacing Pamela Bondi. *See* Fed. R. Civ. P. 25(d) ("[W]hen a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party.").

[3] An appeal does not automatically stay the enforcement of a judgment. *See* 16A *Wright & Miller's Federal Practice & Procedure* § 3954 (5th ed. 2026); *see also* Fed. R. Civ. P. 62(b) (concerning application for stay after entry of judgment); Fed. R. App. P. 8(a) (providing that a party can move to stay district court's judgment pending appeal). And "[u]nless the judgment is stayed, the district court may (pending appeal) act to enforce [it]." *Wright & Miller's Federal Practice & Procedure*, *supra*, at § 3949.1; *see also U.S. Commodity Futures Trading Comm'n v. Escobio*, 946 F.3d 1242, 1251 (11th Cir. 2020) (per curiam) ("Absent entry of a stay, a district court retains jurisdiction to enforce its judgment . . . during the pendency of an appeal."). A party wishing to stay a judgment pending appeal "must ordinarily move first in the district court" for relief, *see* Fed. R. App. P. 8(a)(1)(A), only petitioning to the appellate court if the district court denies the stay or if doing so would be impracticable, *see* Fed. R. App. P. 8(a)(2)(A). Here, the Government has not sought a stay of the judgment granting habeas relief in this Court (or in the Fifth Circuit), nor has a stay been issued. Therefore, it remains within the Court's jurisdiction to enforce its prior judgment— i.e., to rule on the *Motion to Enforce*. (Doc. 31.)

2

2017, Petitioner entered an *Alford* plea[4] in a Maryland state court to the charge of sexual abuse of a child and was sentenced to twenty-one years' imprisonment, with eleven years suspended. (Doc. 46-1 at 85.) He was released early for good behavior and for participation in rehabilitation programs, having served six years. (Doc. 69 at 4; *see also* Doc. 1 at 24; Doc. 46-1 at 39–52.)

Upon his release from prison, Petitioner was immediately transferred to ICE custody, where he moved between detention centers in Virginia, Georgia, Maryland, and Pennsylvania. (Doc. 69 at 4.) On October 20, 2023, an Immigration Judge ordered Petitioner removed from the United States due to his criminal history, but Petitioner was also granted protection from removal to his native Ethiopia under the Convention Against Torture ("CAT") due to his identity as an ethnic Amhara and his participation in political protests in Ethiopia. (*See* Doc. 46-1 at 25–32.)

With appeals, it took nearly one year—until September 5, 2024—for the Removal Order and the grant of CAT Protection to become final. (*Id.* at 29–32.) From that point onward, ICE made no progress toward deporting Petitioner to a third country (i.e., a country other than Ethiopia). And so, ICE released Petitioner under an Order of Supervision ("OSUP") on November 25, 2024—after twenty-three months in immigration detention. (Doc. 46-12 at 6, 11.)

The Court emphasizes the following point, originally made in its February 6, 2026, *Ruling and Order* ("initial *Ruling and Order*") (Doc. 28): Before releasing Petitioner under an OSUP in 2024, ICE first made a finding that Petitioner (1) was not a violent person, (2) would remain nonviolent, and (3) was not a threat to society. (Doc. 28 at 2 (citing 8 C.F.R. § 241.4(e)(2)–(4)); *see also* Doc. 46-1 at 11 (notifying Petitioner that his custody status would be reviewed on or about

---

[4] An *Alford* plea "is one in which the defendant maintains his innocence but agrees to plead guilty." *United States v. Montiel-Cortes*, 849 F.3d 221, 223 n.1 (5th Cir. 2017) (per curiam) (citing *North Carolina v. Alford*, 400 U.S. 25, 37 (1970) ("An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence"—despite maintaining "a protestation of innocence"—when he "concludes that his interests require entry of a guilty plea and the record contains strong evidence of actual guilt.")).

3

December 4, 2024, and that release was "dependent on [his] demonstrating by 'clear and convincing evidence' that [he] **w[ould] not** pose a danger to the community and **w[ould] not** be a significant flight risk" (emphasis in original)); *id.* at 86–87 (releasing Petitioner under an OSUP on November 25, 2024); *Zadvydas v. Davis*, 533 U.S. 678, 683–84 (2001) ("To authorize release, [an Immigration and Naturalization Service] panel must find that the alien is not likely to be violent, to pose a threat to the community, to flee if released, or to violate the conditions of release. And the alien must demonstrate to the satisfaction of the Attorney General that he will pose no danger or risk of flight." (cleaned up) (citing 8 C.F.R. § 241.4(d)(1), (e))); *Trejo v. Warden of ERO El Paso E. Mont.*, 807 F. Supp. 3d 697, 711 (W.D. Tex. 2025) ("[T]he decision to release Trejo pursuant to an OSUP over six years ago, in and of itself, 'reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk.'" (quoting *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018))).

### A.    July 2025 Detention & Habeas Petition

After ICE released Petitioner, he complied with the conditions of his OSUP. And neither the record nor Respondents suggest that Petitioner engaged in any violent or criminal conduct. Although Petitioner complied with all conditions of his release and did not miss a single check-in, on July 17, 2025, he arrived home to find roughly ten ICE agents waiting for him. He was arrested and re-detained. When Petitioner asked why he was being re-detained, the only explanation which the ICE agents reportedly gave was: "Trump is President now." (Doc. 1 at 25; *see also* Doc. 46-9 at 1–7 (including relevant Notice of Revocation of Release and Notice of Removal).)

Petitioner later received a written Notice of Revocation of Release, (*see* Doc. 46-9 at 2)—in English only,[5] (*see* Doc. 69 at 19). The Notice of Revocation relied on undefined "changed

---

[5] Petitioner is a native Amharic speaker, with only a conversational level of English. (Doc. 69 at 19.)

circumstances" and stated that Petitioner's case was under review by several countries which had already rejected Petitioner. (Doc. 28 at 13.) ICE failed to provide the informal interview required by ICE's regulations upon re-detaining Petitioner. (*Id.* at 13, 15–16 (citing Doc. 26 at 19–20).) In other words, Petitioner had no opportunity to respond to or otherwise challenge his re-detention. (*See id.* at 15–16 (citations omitted) (explaining the purpose of an informal interview).) He was then held in ICE custody for more than six months before this Court ordered his release on February 6, 2026. (*Id.* at 4, 38.)

### B.    Initial *Ruling and Order* (Doc. 28)

In its initial *Ruling and Order*, this Court explained that ICE had revoked Petitioner's OSUP without due process. (*See id.* at 9–16.) Given the insufficient notice of revocation, the lack of any timely informal interview, and the absence of changed circumstances, the Court found that ICE had violated the revocation regulations intended to ensure due process—8 C.F.R. §§ 241.4 and 241.13. (*See id.*)[6]

ICE's regulations include procedural requirements, *see* 8 C.F.R. §§ 241.4, 241.13, which must be satisfied at the time of revocation of release, (*see, e.g.*, Doc. 28 at 5–11). Relevant here:

> Once a noncitizen has been released under an OSUP, there are detailed regulations concerning when and how that OSUP may be revoked. *See* [8 C.F.R.] § 241.13(i). . . . An OSUP may . . . be revoked to enforce a removal order when, "on account of changed circumstances, the Service determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* § 241.13(i)(2). When an OSUP is revoked, the noncitizen must "be notified of the reasons for revocation of his or her release" and must be afforded an "initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation." *Id.* § 241.13(i)(3).

---

[6] The initial *Ruling and Order* also addressed the likelihood of removal. But as explained *infra*, Petitioner's removal to a third country (i.e., Eswatini) appeared imminent when he was re-detained on March 9, 2026. (Doc. 36 at 1–2.) The *Motion to Enforce* only raises the issue of whether Petitioner received due process. And so, here, the Court will limit its discussion of the initial *Ruling and Order* to the procedural requirements for revocation of release.

(*Id.* at 6.) The Court also explained that the purpose of a notice of revocation is to provide a noncitizen with sufficient information to respond meaningfully and to contest the reasons for revocation at the informal interview. (*Id.* at 15–16 ("[T]he purpose stated in the regulations is clear: a detainee must have an opportunity to respond to and contest the reason for re-detention.").)

Thus, recognizing that "individuals who have been conditionally released from detention have a protected interest in their 'continued liberty,'" this Court "join[ed] the majority of courts throughout the country," concluding that "ICE's regulations—8 C.F.R. §§ 241.4, 241.13— mandate important procedural safeguards against wrongful detention." (*Id.* at 24 (quoting *Young v. Harper*, 520 U.S. 143, 147 (1997)).) This determination was "especially warranted considering [that] the re-detention of a noncitizen following supervised release deprives them of personal liberty." (*Id.* (citation omitted).) Indeed, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects." (*Id.* at 24 (quoting *Zadvydas*, 533 U.S. at 690).)

And so, the Court found that ICE's failure to adhere to its own mandatory regulations when revoking Petitioner's OSUP deprived him of liberty without due process. The Court therefore granted habeas relief and ordered that ICE release Petitioner under the same conditions as his previous OSUP had imposed. (*Id.* at 38.) Further, the Court prohibited ICE from "re-detain[ing] Petitioner[] without due process of law, in accordance with th[e] Order." (*Id.*)

## C.    Court-Ordered Release from ICE Detention

Petitioner was released from Camp 57 on February 6, 2026. (*See id.* at 38.) According to the *Motion to Enforce*, Petitioner returned to his home state of Maryland on or around February 10, 2026, (Doc. 31-1 at 2), at which time he met with his state probation officer, (Doc. 69 at 20). Because Petitioner had missed several probation appointments while in ICE custody, he had

6

technically violated his probation, resulting in his arrest. (*Id.* at 21.) But eventually, a Maryland judge ordered his release on March 2, 2026. (*Id.*)

Petitioner was not released on or after March 2, 2026. (*Id.* at 21–22.) Instead, he was transferred to another facility in Maryland—Jessup Correctional Institution—for related parole violations.[7] (*Id.*)

Meanwhile, on March 3, 2026, ICE learned that the African nation of Eswatini had accepted Petitioner for third country removal. (Doc. 69 at 70–71.) ICE therefore booked Petitioner—who was still located at Jessup Correction Institution—on a flight to Eswatini leaving from or near Phoenix, Arizona, on March 10, 2026. (*Id.*) Petitioner was unaware that Eswatini had accepted him or that he was slated for deportation to Eswatini. (*See, e.g.*, Doc. 38-1 at 6–7.)

Petitioner remained at Jessup Correctional Institution until March 9, 2026, on which date he was released by the State of Maryland directly into ICE custody. (*Id.* at 2.) Petitioner was immediately transported to Dulles International Airport and placed on a flight to Arizona. (*Id.*) On the evening of March 9, 2026, he arrived at the Arizona Removal Operations Coordination Center ("AROCC"). (Doc. 69 at 71.) After 10:00 p.m. on March 9, 2026, (Doc. 31-1 at 2), Petitioner called his attorneys from AROCC. Petitioner managed to apprise his attorneys of his re-detention and his rough location (i.e., in Arizona), but the call dropped "after a few seconds," (Doc. 38-1 at 3; *see* Doc. 69 at 24 ("[I]mmediately after I made the call, the call dropped."); Doc. 31-1 at 2 (explaining that Petitioner "used his one free 20-second call" to contact counsel)).

---

[7] It is not entirely clear, but based on testimony at the evidentiary hearing, Petitioner was told that he had technically violated his parole for the same reason as he had technically violated his probation—i.e., Petitioner had missed appointments while in ICE custody. (*See* Doc. 31-1 at 2; Doc. 69 at 22.)

**D.**    ***Motion to Enforce* (Doc. 31)**

Petitioner's attorneys filed the *Motion to Enforce* early in the morning on March 10, 2026. (*See* Doc. 31-1 at 1–2.) They believed that Petitioner had been re-detained without any indication that he would be removed from the United States in the reasonably foreseeable future, without having the opportunity to object to re-detention, and without receiving notice of the revocation of his supervised release. (*See id.* at 3–5.) Later that day, Petitioner's counsel learned that Petitioner was "on his way to the airport"—likely for deportation. (Doc. 34 at 1.) Counsel therefore filed the *Motion for TRO* (Doc. 34). The Court held a Status Conference that afternoon, after which it granted the TRO to allow time to consider the *Motion to Enforce*. (*See* Doc. 36 at 1, 7.)

It was during the March 10, 2026, Status Conference that the Court—and Petitioner's counsel—learned from Respondents' counsel that Petitioner was to be deported to Eswatini. (*Id.* at 1–2.) Eswatini is a small country in Africa, about one-seventh the size of Louisiana. Petitioner has no connection to Eswatini. (Doc. 38-1 at 6.) When granting the TRO, the Court also ordered simultaneous briefing addressing the process afforded Petitioner upon his re-detention and the process due for third country removal. (Doc. 36 at 7.)

In their briefing, Respondents present the Declaration of ICE Acting Deputy Field Office Director Vernon Liggins ("AFOD Liggins" or "Liggins"), who signed the Notice of Revocation of Release dated March 6, 2026. (Doc. 37-1 at 1–2.) Respondents suggest that Petitioner was served with the executed Notice of Revocation of Release and the Notice of Removal to Eswatini, and was given an informal interview on March 10, 2026—the day after he arrived in Arizona. (Doc. 37 at 2 (citations omitted); *accord* Doc. 37-1 at 2.) Respondents assert that Petitioner refused to sign the documents, (Doc. 37 at 2; Doc. 37-2 at 2; Doc. 37-3), and that Petitioner did not provide any written or oral statements during his informal interview, (Doc. 37-1 at 2; Doc. 37-4).

Conversely, Petitioner's brief alleges that, on March 9, 2026, Petitioner was transported from Jessup Correctional Institution to Dulles International Airport, where ICE agents told Petitioner that they were taking him to Arizona but did not provide any other information. (Doc. 38-1 at 2–3.) When Petitioner landed in Arizona, an ICE officer asked him to sign papers, but he refused to do so without his attorneys. Petitioner was not actually offered or shown any papers. (*Id.* at 3.) Once in a holding cell, Petitioner was able to call his attorneys, but the call quickly dropped. (*Id.*) On the afternoon of March 10, 2026, another person requested that Petitioner sign papers. (*Id.* at 4–5.) This person did not explain the papers or hand them to Petitioner. (*Id.*) When Petitioner asked questions, this person said that he was not an ICE agent. (*Id.* at 5.) When Petitioner said that he would not sign papers without his attorneys, the person walked away with the papers. (*Id.*) Petitioner avers that he was never apprised of the country of removal, properly notified of the reasons for his re-detention, or provided an informal interview in order to contest his re-detention. (*Id.* at 5–7.) And because Petitioner was not told that he was slated for deportation to Eswatini specifically, he could not raise any credible fear or withholding claims. (*See id.* at 6.) At around 4:00 p.m. on March 10, Petitioner was informed that his flight was canceled, and he was transported to a detention center. (*Id.* at 5.) Only when speaking with his attorneys on March 11, 2026, did Petitioner learn that ICE was planning to deport him to Eswatini. (*Id.* at 6.)

Given the meaningful factual discrepancies between Petitioner's version of events and Respondents', the Court deemed it necessary to hold an evidentiary hearing in order to determine whether Petitioner's re-detention complied with the procedural requirements for revocation of his supervised release, or whether Petitioner was deprived of liberty without due process, in violation of this Court's initial *Ruling and Order*. (Doc. 40 at 1–4.)

At the evidentiary hearing on March 25, 2026, Petitioner testified in person through an Amharic interpreter. (Doc. 43; Doc. 69 at 2, 19–45.) Respondents called AFOD Liggins, (Doc. 69 at 2, 46–97), as well as Deportation Officer José Gonzalez ("Gonzalez"), who signed the proofs of service on the relevant Notice of Revocation of Release and Notice of Removal, and who signed the relevant "Alien Informal Interview" form, (*id.* at 2, 97–149; *see also* Doc. 37-2; Doc. 37-3; Doc. 37-4). Respondents' witnesses testified remotely (i.e., by Zoom).

## II.    DISCUSSION

Below, the Court first considers the conflicting testimony and evidence presented at the March 25, 2026, evidentiary hearing and then resolves whether Petitioner was re-detained without due process of law—in other words, whether ICE violated the Court's initial *Ruling and Order* when it re-detained Petitioner for removal to a third country.

### A.    Testimony & Evidence

#### 1.    *Declaration & Testimony of AFOD Liggins*

AFOD Liggins testified that ICE revoked Petitioner's OSUP because Eswatini was willing to accept Petitioner. (Doc. 69 at 50.) Liggins also testified that, to his knowledge, Petitioner was served with the Notice of Revocation of Release upon arriving in Arizona. (*Id.*) This testimony, however, was based solely on the fact that the Notice of Revocation, with signed proof of service, was scanned and sent to Liggins by ICE officers in Arizona. (*Id.* at 50, 72.) Liggins further testified that, although he signed a Notice of Revocation of Petitioner's February 6, 2026, OSUP (i.e., the OSUP issued after Petitioner's Court-ordered release from Camp 57), the only Notice of Revocation in the record indicates revocation of Petitioner's November 25, 2024, OSUP. (*Id.* at 76; *see also* Doc. 37-2 at 1.) Liggins explained that, after he had digitally signed the Notice of Revocation, changes could still be made to the document, and ICE officers in Arizona later changed the date from February 6, 2026, to November 25, 2024. (Doc. 69 at 78–79.) Liggins

10

conceded that he had no evidence that Petitioner was actually served with a Notice of Revocation of the operative OSUP (i.e., the February 6, 2026, OSUP). (*Id.* at 79.)

And critical here, although Liggins knew before signing the Notice of Revocation on March 6, 2026, that Petitioner had been accepted for removal to Eswatini and had a seat on a March 10 flight, the Notice of Revocation failed to indicate that Petitioner was being re-detained for the purpose of removal to Eswatini. (*Id.* at 79–81.) Instead, it stated that Petitioner's case was "under review for removal to an alternate country." (*Id.* at 80; Doc. 37-2 at 1.) Finally, based on the certificate of service, Liggins testified that Petitioner was given an informal interview upon revocation of his OSUP. (Doc. 69 at 87–88.) But Liggins was unable to provide any details about this interview because he had no personal knowledge of what actually transpired on March 10, 2026; instead, his testimony was based on his understanding of what was in the written documents. (*Id.* at 86–88); *see also A.B.D. v. Wamsley*, No. 25-2014, 2026 WL 178306, at *12 (D. Or. Jan. 22, 2026) (refusing to credit ICE agent's recounting of events where agent "was not present at the time" when those events occurred). Also important, Liggins further testified that, when a detainee refuses to give an oral statement at the interview, an officer should indicate that refusal on the informal interview form. (Doc. 69 at 95–96; *see also* Doc. 47-1 at 2.)

### 2.    *Petitioner's Declaration & Testimony*

In his Declaration, Petitioner stated that, on March 9, 2026, he was transported by ICE from Jessup Correctional Institution in Maryland to a holding cell located near an airstrip in Phoenix, Arizona. (Doc. 38-1 at 1–4.) Sometime in the afternoon on March 10, Petitioner was escorted from the holding cell "into a hallway," where someone approached and "said that there were some papers . . . that [Petitioner] needed to sign." (*Id.* at 4.) The individual "flipped through the papers in his hand, and [Petitioner] recognized one of th[e] documents as a Notice of

Revocation of Release." (*Id.*) According to Petitioner, he also "recognized another paper" as the Notice of Removal, "but it was blank, and did not have any country listed as far as [Petitioner] could see." (*Id.*) Petitioner swore that he did not see any other papers, was not given any paperwork, was not provided with an explanation of any paperwork, was not advised that he was being deported to Eswatini, and was not asked any questions about himself. (*Id.* at 4–7.) And while Petitioner "asked why [he] was being detained now, when [he] had just been released so recently," this question went unanswered. (*Id.* at 5.)

On direct examination, Petitioner (via translator) testified similarly: On March 10, 2026, two people escorted Petitioner from his holding cell into a hallway. (Doc. 69 at 25.) One of these individuals was holding papers. (*Id.*) He identified the top page as a "revocation paper" and "asked [Petitioner] to sign it." (*Id.* at 25–26.) Petitioner clarified that he was not shown the top page but could see it because he was standing close to the individual who was holding the papers. (*Id.*) Petitioner was not given a copy of the top page. (*Id.*) And he refused to sign without his attorney. (*Id.*) According to Petitioner, he asked for "details about [his] situation," but the person with the papers told Petitioner that he was only there to collect Petitioner's signature and that "he was not an ICE officer." (*Id.*) Ultimately, the individual did not show or hand Petitioner any other papers. (*Id.* at 26.) No one advised Petitioner that he was being deported to Eswatini. (*Id.* at 32.)

The Court notes one inconsistency between Petitioner's testimony and his Declaration: In his Declaration, Petitioner swore that he had seen both the top page of the Notice of Revocation and the Notice of Removal. (Doc. 38-1 at 4.) But on direct examination, Petitioner testified that he had seen *only* the Notice of Revocation—because it was the top page of the stack of documents which the other individual was holding. (Doc. 69 at 25–26.) And when, during his testimony, Petitioner was shown a copy of the Notice of Revocation, he testified that it did *not* "look like what

12

the [individual] was holding in his hand in the hallway." (*Id.* at 28–29, 42.) On cross-examination, Petitioner repeated that he saw only the top page and that he recognized it as the Notice of Revocation because it looked like a notice which he had seen previously. (*Id.* at 37–41.)[8]

Ultimately, the Court notes that Petitioner has been consistent about the following: (1) He "w[as] not given copies of [any] papers or an opportunity to review [the] paperwork that the officer had in his hand."[9] (*Id.* at 35, 43–44; *accord* Doc. 38-1 at 4–7.) (2) He was not given an informal interview. (Doc. 69 at 44; *accord* Doc. 38-1 at 7.) And (3) he refused to sign any papers without speaking with his attorneys. (Doc. 69 at 25–26; *accord* Doc. 38-1 at 5, 7.)

### 3.    *José Gonzalez's Testimony*

The individual with whom Petitioner spoke on the afternoon of March 10, 2026, was José Gonzalez. Gonzalez testified that he has been an ICE deportation officer for more than nine years—the entire time that he has worked for ICE. (Doc. 69 at 99.) His job "involve[s] interacting with individuals who are going to be removed from the United States," usually on the day of deportation. (*Id.* at 100; *see also id.* at 115–16.) Specifically, Gonzalez is responsible for (1) "serving documents on individuals who are being removed from the United States," and (2) "conducting informal interviews" of such individuals. (*Id.* at 100; *see also id.* at 112, 115–16.)

---

[8] The Court is mindful that Petitioner's first language is Amharic and that he speaks only conversational English. (*See, e.g.*, Doc. 43; Doc. 69 at 19; *see also* Doc. 46-4 at 13–15 (reflecting that an Amharic interpreter was present at an October 10, 2023, hearing before an immigration judge).) While an Amharic interpreter was present at the hearing, one was not present during Petitioner's interaction with Gonzalez. *See also United States v. Lopez-Collazo*, 824 F.3d 453, 461 (4th Cir. 2016) (explaining that noncitizen may be denied an "opportunity to be heard at a meaningful time and in a meaningful manner" where noncitizen requires "translation assistance in order to understand the . . . [notice of removal] [or] legal proceedings").

[9] On cross-examination, Petitioner acknowledged that he did not ask for copies or to review the papers in the other individual's hand and did not ask the other individual to explain the papers. (*Id.* at 36.) This line of questioning by Respondents' counsel seems to the Court a red herring. The onus cannot be on noncitizen detainees to afford themselves due process (e.g., by requesting service of documents, by interviewing themselves). *See Esmail v. Noem*, No. 25-8325, 2025 WL 3030589, at *6 (C.D. Cal. Sept. 26, 2025) ("[B]oth the due process clause and the governing statute place the burden on the government – regardless of whether the country of deportation is designated during or after the removal hearing – to provide a meaningful opportunity to be heard . . . ." (quoting *Nguyen v. Scott*, 796 F. Supp. 3d 703, 727 (W.D. Wash. 2025) (quoting *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1010 (W.D. Wash. 2019)))).

Gonzalez testified that he has received training, including on "how to . . . interact with [deportees]," how to conduct informal interviews, and how to read/understand the necessary deportation paperwork. (*Id.* at 101.)

Gonzalez first learned of Petitioner on March 10, 2026—the date on which Petitioner was to be deported to Eswatini. (*Id.* at 101–02.) According to Gonzalez, he received the deportation paperwork for Petitioner via e-mail on March 10. (*Id.* at 103–04.) He printed out the paperwork and, with one other deportation officer accompanying,[10] went to serve Petitioner. (*Id.* at 104.)

On direct examination, Gonzalez testified that he and Petitioner had a conversation which lasted approximately four to seven minutes. (*Id.* at 105–06; *see also id.* at 112–13.) According to Gonzalez, Petitioner comprehended the conversation; Petitioner did not request an interpreter and, in fact, "spoke very good English." (*Id.* at 106, 135, 144.) Gonzalez could not recall anything that Petitioner said during their four-to-seven-minute-long conversation. (*Id.* at 106.) But Gonzalez nonetheless insisted that Petitioner's statements "had nothing to do with [Petitioner's] case." (*Id.*)

Gonzalez stated that he "presented the [deportation] documents to [Petitioner]" and that Petitioner "did not want to engage with [Gonzalez] at all." (*Id.* at 105.) Subsequently, Gonzalez clarified that he attempted to explain the documents to Petitioner but that Petitioner "wasn't listening to what [Gonzalez] had to say." (*Id.* at 105, 109; *see also id.* at 105–13.) Petitioner merely "verbalized that he was not going to sign any of the paperwork that [Gonzalez] w[as] trying to present [to] him." (*Id.* at 107; *see also id.* at 109–10.) Petitioner did not request to speak to an attorney, did not give Gonzalez any additional documents, and did not "raise any fear-based claims" (e.g., about deportation to Eswatini). (*Id.* at 110, 113.)

---

[10] Gonzalez testified that he has been trained to bring another deportation officer with him when serving documents so that this second officer can be a witness to the service. (Doc. 69 at 104.) This second officer, whom Gonzalez identified as Dequan Lin, (*see id.* at 125), was—and is—unknown to the Court. Respondents did not make the Court aware of this individual, offer his declaration, or seek to call him as a witness. (*See id.* at 159.)

On cross-examination, Gonzalez's testimony was, for a brief time, more or less consistent with the above. Gonzalez confirmed that he (1) "personally served" Petitioner with the Notice of Revocation, the Notice of Removal, and the Informal Interview Form and (2) conducted the requisite informal interview. (*Id.* at 122–23.) According to Gonzalez, he gave Petitioner "as much time as [Petitioner] needed" to review the documents. (*Id.* at 126–27.) And when asked whether Petitioner read the documents, Gonzalez responded: "He didn't want to engage with me. He didn't want to read any of the documents[,] from what I recall." (*Id.* at 127.) After "look[ing] at the first piece of paper" in the stack which Gonzalez was holding—the Notice of Revocation—Petitioner verbally refused to sign any documents. (*See id.* at 128–31.)

Soon, however, Gonzalez began to paint a *very* different picture of his interaction with Petitioner. Gonzalez testified that he "understand[s] that personal service means delivery of a document personally to the person." (*Id.* at 130.) But despite this understanding, Gonzalez did not give a copy of the Notice of Revocation to Petitioner, nor did he send a copy to Petitioner's attorneys, even though the document prompted him to consider doing so. (*Id.* at 130–31.)

Additionally, Gonzalez could not recall whether he was the deportation officer who filled out the Notice of Removal. (*Id.* at 133.) And while Gonzalez was at first unequivocal that he personally served Petitioner with the Notice of Removal during their interaction, (*id.* at 132–33; *see also id.* at 134), he quickly amended his testimony, stating that he could not recall if he even *showed* the Notice of Removal to Petitioner, (*id.* at 134). In the end, Gonzalez could only say that he attempted to explain the Notice of Removal to Petitioner but that Petitioner "was not engaging," by which Gonzalez meant that Petitioner "wasn't asking [Gonzalez] questions." (*Id.* at 134–35.) When asked a second time whether he "provide[d] [Petitioner] with an opportunity to review" the

Notice of Removal, Gonzalez said that he could not recall. (*Id.* at 135.) Gonzalez testified with certainty, however, that he did not give Petitioner a copy of the Notice of Removal. (*Id.* at 136.)

Next, Gonzalez testified that Petitioner "didn't let Gonzalez have the opportunity" to conduct the informal interview because Petitioner was not engaging with Gonzalez. (*Id.* at 137–38.) But Gonzalez readily admitted that Petitioner did not walk away from Gonzalez during their interaction and, indeed, "could still hear what [Gonzalez] w[as] saying." (*Id.* at 138.) Gonzalez could not recall whether he told Petitioner "that the interview . . . was required by the [OSUP] regulations." (*Id.*) In his very next answer, however, Gonzalez acknowledged that he himself was unaware that the regulations require an informal interview. (*Id.* at 138–39.)

Although Gonzalez purported to have conducted "hundreds" of informal interviews, he struggled to say what kinds of questions he asks deportees. (*See id.* at 139–40 ("Well, just—like, for me, an alien informal interview is just documentation that a conversation was made—was had.").) Ultimately, Gonzalez explained that he usually asks deportees (1) for additional documents and (2) if they would like to "make some type of statement regarding their . . . case or the revocation." (*Id.* at 140.) In back-to-back answers, Gonzalez testified that he recalled "trying to ask [Petitioner] a few questions" but also that he could not recall if he asked Petitioner *any* questions. (*Id.* at 141–42.) Gonzalez could not recall whether he told Petitioner that Petitioner "was going to be removed to Eswatini." (*Id.*) And he could not recall whether he asked Petitioner whether Petitioner had any additional documents for his case, despite indicating on the Informal Interview Form that Petitioner "'did not' provide [additional] documents." (*Id.* at 143–45.)

Gonzalez did not record any of the details of his conversation with Petitioner, even though the Informal Interview Form provided space for him to do so. (*Id.* at 143–44.) On the form, Gonzalez indicated that Petitioner "'did not' provide a written statement." (*Id.* at 144–45.) But

Gonzalez could not recall whether he asked Petitioner to provide a written statement. (*Id.* at 145.) And even though Liggins testified that a deportation officer should note on the form if a detainee refuses to make an oral statement, (*id.* at 95–96), Gonzalez left no notes to that effect, (Doc. 37-4 at 1). Lastly, Gonzalez did not give Petitioner a copy of the Informal Interview Form. (*Id.* at 144.)

As the above reflects, Gonzalez's testimony about his interaction with Petitioner was awash with contradiction. More concerning still, Gonzalez regularly testified that he could not recall key details of the interaction, even though it had taken place just fifteen days before the hearing. Below, the Court highlights several of the more troubling inconsistencies and holes in Gonzalez's testimony:

| On the one hand: | On the other: |
| --- | --- |
| During the conversation, Petitioner did not request an interpreter; in fact, Petitioner "spoke very good English." (Doc. 69 at 106, 135, 144.) Petitioner also verbally refused to sign any documents—and presumably did so in English. (*Id.* at 107, 109–10, 128–31.) Otherwise, Petitioner's statements to Gonzalez had nothing to do with Petitioner's case/ impending deportation. (*Id.* at 106.) | Although Petitioner supposedly "spoke very good English," and although he and Gonzalez had a four-to-seven-minute-long conversation a mere two weeks before the hearing, (*id.* at 105–06, 112–13), Gonzalez could not recall *anything* that Petitioner said, (*id.* at 106). Gonzalez also did not record any of the details of the conversation in the space provided on the Informal Interview Form. (*Id.* at 144.) |
| Gonzalez has been a deportation officer for more than nine years. (*Id.* at 99.) One of his primary responsibilities is conducting informal interviews. (*See id.* at 100, 112, 115–16.) He has received training on how to conduct informal interviews. (*Id.* at 101.) He has conducted "hundreds" of informal interviews in his time as a deportation officer. (*Id.* at 139.) | Gonzalez was unaware that the regulations require that deportees receive an informal interview. (*Id.* at 138–39.) And he struggled to say what kinds of questions he usually asks deportees during informal interviews. (*See id.* at 139–40.) Ultimately, he stated that he asks for additional documents and for statements from deportees. (*Id.* at 140.) But he could not recall whether he asked Petitioner for additional documents. (*Id.* at 145.) And he could not recall whether he asked Petitioner to provide a written statement. (*Id.*) In fact, Gonzalez could not recall whether he asked Petitioner *any* questions. (*Id.* at 141–42.) |

17

| | |
|---|---|
| Petitioner "did not want to engage with [Gonzalez] at all." (*Id.* at 105; *see also id.* at 105, 107, 109, 112, 126–29, 135, 137–38, 141–42, 145.) | At no point did Petitioner physically disengage from the conversation (e.g., by walking away). (*Id.* at 137–38.) Petitioner could always "hear what [Gonzalez] was saying." (*Id.* at 138.) And according to Gonzalez, Petitioner was clearly following the conversation, even though it was in English. (*Id.* at 106, 135, 144.) Petitioner was speaking to Gonzalez, although Gonzalez could not recall anything that Petitioner said to him. (*See, e.g.*, *id.* at 106–107, 109–10, 128–31.) Ultimately, Gonzalez settled on the explanation that, when he said that Petitioner "was not engaging," he meant that Petitioner "wasn't asking [him] questions." (*Id.* at 134–35.) |
| Petitioner did not "raise any fear-based claims" (e.g., about deportation to Eswatini). (*Id.* at 113.) | Gonzalez could not recall whether he was the deportation officer who filled out the Notice of Removal. (*Id.* at 133.) He could not recall if he even showed the Notice of Removal to Petitioner. (*Id.* at 134.) And critically, he could not recall if he ever told Petitioner that Petitioner "was going to be removed to Eswatini." (*Id.* at 141–42.) But he was certain that he did *not* give Petitioner a copy of the Notice of Removal. (*Id.* at 136.) |
| Gonzalez printed all the necessary paperwork and went to serve Petitioner. (*Id.* at 104.) He "personally served" Petitioner with all documents and gave Petitioner "[a]s much time as [Petitioner] needed" to review them. (*Id.* at 126–27.) | Gonzalez understands what personal service entails. (*Id.* at 130.) Nevertheless, he did not give a copy of the Notice of Revocation to Petitioner, nor did he send a copy to Petitioner's attorneys. (*Id.* at 130–31.) Likewise, he did not give Petitioner a copy of the Notice of Removal. (*Id.* at 136.) And he did not give Petitioner a copy of the Informal Interview Form. (*Id.* at 144.) In fact, Gonzalez could not recall if he even showed anything other than the top page of his stack of papers to Petitioner. (*See id.* at 128–31, 134–35, 143– |

|  | 45.) Nor does it appear that Gonzalez ever fully explained the various documents to Petitioner. (*See, e.g., id.* at 134–35, 137–39, 141–42.) |
| --- | --- |

The Court finds that Gonzalez's testimony was generally less than credible. But Gonzalez made certain statements without equivocation and without contradiction: (1) He did not give Petitioner a copy of the Notice of Revocation. (*Id.* at 130–31.) (2) He did not give Petitioner a copy of the Notice of Removal. (*Id.* at 136.) And (3) he did not give Petitioner a copy of the Informal Interview Form. (*Id.* at 144.) Gonzalez also could not recall if he told Petitioner that Petitioner "was going to be removed to Eswatini," and he could not recall if he asked Petitioner *any* questions. (*Id.* at 141–42.) Significantly, these statements are consistent with Petitioner's Declaration and Petitioner's testimony at the evidentiary hearing. (*See, e.g.*, Doc. 38-1 at 4–7; Doc. 69 at 25–26, 35, 43–44.) The Court will therefore accept them.

Having considered the evidence and testimony, and having resolved any factual inconsistencies, the Court now turns to the applicable law.

### B.    Due Process—Revocation of OSUP

The Court's initial *Ruling and Order* released Petitioner from ICE detention under the conditions of his prior OSUP and made clear that he could not be re-detained by ICE "without due process of law." (Doc. 28 at 38.)

The Due Process clause of the Fifth Amendment prohibits government deprivations of life, liberty, and property without due process of law. The essence of procedural due process is that a person at risk of a serious loss must be given notice and an opportunity to be heard in a meaningful manner and at a meaningful time. *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

It is firmly established that these protections extend to noncitizens present in the United States. *See Trump v. J. G. G.*, 604 U.S. 670, 672–73 (2025) (per curiam). "Even those who face

significant constraints on their liberty or those over whose liberty the government wields significant discretion retain a protected interest in their liberty." *Rosado v. Figueroa*, No. 25-2157, 2025 WL 2337099, at *11 (D. Ariz. Aug. 11, 2025). And so, individuals like Petitioner, "who have been conditionally released from detention[,] have a protected interest in their 'continued liberty.'" *Villanueva v. Tate*, 801 F. Supp. 3d 689, 704 (S.D. Tex. 2025) (quoting *Young v. Harper*, 520 U.S. 143, 147 (1997)).

To revoke release and deprive a noncitizen of that liberty, ICE's regulations require that the noncitizen be given (1) notification of the reason(s) for revocation upon detention, and (2) an informal interview, conducted "promptly" after the noncitizen's return to custody. 8 C.F.R. § 241.4(l)(1); *accord id.* § 241.13(i)(3). These procedural requirements "are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked." *Gurung v. Warden, S. Tex. Ice Processing Ctr.*, No. 25-1614, 2026 WL 93145, at *4, *8 (W.D. Tex. Jan. 6, 2026). And so, the regulation's procedures "are not optional or discretionary; they must be followed, and failure to do so" violates due process and "renders the detention unlawful." *Delkash v. Noem*, No. 25-1675, 2025 WL 2683988, at *6 (C.D. Cal. Aug. 28, 2025); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (2025) (statement of Sotomayor, J.) (explaining that ICE must comply with these regulations, or else it violates due process); *Khamba v. Albarran*, No. 25-1227, 2025 WL 2959276, at *7 (E.D. Cal. Oct. 17, 2025) (same); *Diaz v. Wofford*, No. 25-1079, 2025 WL 2581575, at *8–10 (E.D. Cal. Sept. 5, 2025) (same).

### 1.    Notice of Revocation of Release

"[U]pon revocation," a noncitizen must "be notified of the reasons for revocation of his or her release." 8 C.F.R. § 241.4(l)(1). The undisputed purpose of this requirement is to give the

noncitizen an opportunity to respond to or otherwise contest the reasons for the revocation. Here, the Notice of Revocation did not comply with the regulation in multiple ways.

a.    ICE failed to provide notice upon revocation.

The written Notice of Revocation must be provided to the noncitizen "upon revocation." 8 C.F.R. § 241.4(l)(1). Here, Petitioner was taken into ICE custody on March 9, 2026, in Maryland. But he was not provided with a Notice of Revocation or any other written document providing sufficient notice that his release had again been revoked or that his deportation to a third country was imminent. Indeed, ICE did not even attempt to serve Petitioner with the Notice of Revocation until the following day (March 10), just hours before he was to be deported. The Notice of Revocation was already signed by AFOD Liggins days earlier—on March 6, 2026. (Doc. 69 at 49.) In other words, it was readily available. [11] Even still, Respondents offer no sufficient explanation for this delay. Other courts have found that similar delays do not comply with the regulatory mandate that notice be given "[u]pon revocation." *See Funes v. Francis*, 810 F. Supp. 3d 472, 494 (S.D.N.Y. 2025) (Petitioner's re-detention was unlawful where "the Notice was not provided to Funes upon revocation. Funes was notified of the revocation at the start of her check-in . . . at approximately 8:30 a.m. From that point forward, she was not free to leave. And by at least 1:03 p.m., Funes had been placed in a cell . . . . [S]he did not receive the notification until many hours after revocation." (cleaned up)); *M.S.L. v. Bostock*, No. 25-1204, 2025 WL 2430267, at *10 (D. Or. Aug. 21, 2025) ("Although § 241.4(l)(1) requires that she be notified of the reasons for the detention 'upon revocation [of release],' Petitioner was not provided with a Notice of Revocation until July 12, 2025, two days after she was taken into custody.").

---

[11] *See Aden*, 409 F. Supp. 3d at 1009–10 ("Once travel documents were obtained, however, ICE withheld information and provided no opportunity to challenge the designation or seek withholding of deportation. ICE took petitioner back into custody and refused to tell him what was going on or what they were planning to do with him.").

b.        Petitioner was not served with the Notice of Revocation.

And not only was the Notice of Revocation not timely provided "upon" Petitioner's return to ICE custody—Petitioner was never personally served with a copy of the Notice of Revocation at any time thereafter. *See* 8 C.F.R. § 103.8. Gonzalez filled out the "Proof of Service" portion of the Notice of Revocation, (Doc. 37-2 at 2), but he testified that he did not actually give a copy of the Notice of Revocation (or any other document, including the Notice of Removal) to Petitioner on March 10, 2026. In fact, he could not recall whether he had even shown any of these papers to Petitioner. Petitioner testified that he only saw the first page of the Notice of Revocation because it was at the top of the stack of papers in Gonzalez's hand. From both Petitioner's and Gonzalez's testimony, it seems clear that Petitioner did not actually read that top page; he merely recognized it because it was similar to notifications which he had seen previously. *See also K.E.O. v. Woosley*, No. 25-74, 2025 WL 2553394, at *6 (W.D. Ky. Sept. 4, 2025) ("[K.E.O.] was given no copies of any document providing a notice of or justification for the termination of her supervised release pursuant to her OSUP . . . [or] any documentation . . . that explained the basis for her removal [from] supervision and detention. . . . By failing to do these actions, ICE has necessarily violated due process because it thwarts petitioner's ability to contest that action." (cleaned up)); *McSweeney v. Warden of Otay Mesa Det. Facility*, No. 25-2488, 2025 WL 2998376, at *6 (S.D. Cal. Oct. 24, 2025) (granting habeas where noncitizen "could not have meaningfully responded to the proffered reasons for revocation when he had not yet even been informed of those reasons").

c.        Notice lacked sufficient information.

But even if Petitioner had been given a copy of the Notice of Revocation, the result would be the same, because the notice itself did not comply with ICE's regulations. Indeed, the notice failed to explain the "reasons for revocation" or otherwise provide sufficient information regarding

22

the circumstances of Petitioner's re-detention. 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3).

A notice of revocation is intended to adequately inform the detainee "of the basis for the revocation decision such that he c[an] meaningfully respond at the post-detention 'informal interview.'" *Diaz*, 2025 WL 2581575, at *8 (quoting *Perez-Escobar v. Moniz*, No. 25-11781, 2025 WL 2084102, at *2 (D. Mass. July 24, 2025) (quoting 8 C.F.R. § 241.4(l)(1))); *see also Sarail A. v. Bondi*, 803 F. Supp. 3d 775, 779–80, 783–84 (D. Minn. 2025) (finding that a notice that cited only "changed circumstances" without any explanation failed to comply with ICE's regulations); *see also Yee S. v. Bondi*, 806 F. Supp. 3d 894, 902 (D. Minn. 2025) (discussing similar cases); *Pham v. Warden*, No. 25-1873, 2026 WL 673404, at *13 (E.D. Cal. Mar. 10, 2026) ("When the government fails to include the reasons for revocation of release in the notice of revocation, it also deprives the noncitizen of the opportunity to respond to those reasons as required under 8 C.F.R. § 241.13(i)(3)."), *report and recommendation adopted*, 2026 WL 849861 (E.D. Cal. Mar. 27, 2026); *Torres-Jurado v. Biden*, No. 19-3595, 2023 WL 7130898, at *4 (S.D.N.Y. Oct. 29, 2023) (deeming notice of revocation deficient where it failed to make proper findings that "it was appropriate to enforce a removal order," and "instead stat[ed] only that a travel document appears forthcoming" (cleaned up)).

Here, the Notice of Revocation includes nothing more than checked boxes on ICE's standard form:

DEPARTMENT OF HOMELAND SECURITY
U.S. Immigration and Customs Enforcement

**NOTICE OF REVOCATION OF RELEASE**

Alien Name: Mohammed, Ibrahim Ali                    A- File #: ███ 025

Your release on the order of supervision (OSUP) issued to you on or about _____ 11/25/2024 _____ is hereby
                                                                                    Date OSUP Issued (MM/DD/YYYY)

revoked. You will remain detained in U.S. Immigration and Customs Enforcement (ICE) custody at this time.

☒ Your release has been revoked pursuant to 8 C.F.R. § 241.4(l), for the following reason(s):

☐ The purposes of release have been served.

☐ You violated a condition of your release. Specifically, you:

(Information about how condition of release violated)

☒ It is appropriate to enforce the removal order entered against you as ICE has the ability and means to effectuate your removal.

☐ ICE has obtained a travel document and scheduled your removal to take place no later than:

_____
Date (MM/DD/YYYY)

☐ ICE is seeking a travel document to effect your expeditious removal to _____
                                                                          Country of Removal

☒ On _____ 09/05/2024 _____, you were ordered removed to _____ Ethiopia _____, but you
        Date (MM/DD/YYYY)                                          Country

were granted withholding of removal to _____ Ethiopia _____. Your case is under review
                                               Country

for removal to an alternate country.

(Doc. 37-2 at 1.)[12] No additional information is provided on the Notice of Revocation. (*See id.* at 1–2.) And while the Notice of Removal does identify Eswatini as the country of removal, that document was not shown to Petitioner or provided to him. What's more, Gonzalez did not recall telling Petitioner that he would be deported to Eswatini, even though Petitioner had a seat on a flight departing that very afternoon.[13] But according to AFOD Liggins, ICE knew as early as March 3, 2026, that Eswatini had accepted Petitioner for removal. And when Liggins signed the Notice of Revocation on March 6, 2026, he also knew that Petitioner had a seat on the March 10, 2026, flight to Eswatini. This information was crucial to Petitioner, who in fact did fear removal

---

[12] Again, AFOD Liggins explained that ICE officers in Arizona had changed the date on the Notice of Revocation of Release—from February 6, 2026, to November 25, 2024—after Liggins had signed the document. (Doc. 69 at 78–79.)
[13] While the applicable regulations require that notice be in writing, Gonzalez's silence still added to the constitutional deprivation—i.e., by further preventing any meaningful opportunity to respond. *See Funes*, 810 F. Supp. 3d at 493 (stating that notice of revocation and reasons must be in writing).

24

to Eswatini. (*See, e.g.*, Doc. 38-1 at 7; Doc. 38 at 12–13 & nn.11–13 (collecting sources suggesting that individuals removed to Eswatini will ultimately be repatriated).) The country of removal (Eswatini) was readily available information, known to ICE. But this information was not provided to Petitioner. ICE's failure to disclose it shut out any opportunity for Petitioner to assert any fear-based claims.

### 2. Notice of Third Country Removal

"[A] 'noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation.'" *Nguyen v. Scott*, 796 F. Supp. 3d 703, 727 (W.D. Wash. 2025) (quoting *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1009 (W.D. Wash. 2019)); *see also Andriasian v. Immigr. & Naturalization Serv.*, 180 F.3d 1033, 1041 (9th Cir. 1999) ("[I]ndividuals whose rights are being determined are entitled to notice of the issues to be adjudicated, so that they will have the opportunity to prepare and present relevant arguments and evidence."); *Gomez v. Mattos*, No. 25-975, --- F. Supp. 3d ---- , 2025 WL 3101994, at *6 (D. Nev. Nov. 6, 2025) (quoting the foregoing authorities with approval). "In the context of country of removal designations, last minute orders of removal to a country may violate due process if an immigrant was not provided an opportunity to address his fear of persecution in that country." *Nguyen*, 796 F. Supp. 3d at 727 (quoting *Najjar v. Lynch*, 630 F. App'x 724 (9th Cir. 2016)).

ICE's current *Guidance Regarding Third Country Removals* ("the March 2025 Guidance") was issued in March 2025. (Doc. 37-5.) Where the third country has provided diplomatic assurances (deemed credible) that the noncitizen will not be tortured, the March 2025 Guidance does not require advanced notice of the country of deportation, and directs: "Immigration officers will not affirmatively ask whether the [noncitizen] is afraid of being removed to that country."

(Doc. 37-5 at 2.) But the Supreme Court has recently held that giving "notice roughly 24 hours before removal"—as the March 2025 Guidance allows—"devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster." *A. A. R. P. v. Trump*, 605 U.S. 91, 95 (2025) (per curiam); *see also Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands."). And numerous courts throughout the country have found that ICE's March 2025 Guidance "violates due process." *Kumar v. Wamsley*, No. 25-2055, --- F. Supp. 3d ---- , 2025 WL 3204724, at *5–6 (W.D. Wash. Nov. 17, 2025) (collecting cases); *see also Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1008 (S.D. Tex. 2025) (explaining that noncitizen was likely to succeed on "his claim that he cannot be removed to a third country without sufficient notice and a meaningful opportunity to raise a claim, and that Respondents' failure to provide him with review of his negative [Reasonable Fear Interview, or RFI] determination deprives him of his rights under the Due Process Clause of the Fifth Amendment").[14]

The record before the Court supports that, when Petitioner was "on his way to the airport," he still did not know his country of removal—Eswatini. (*See, e.g.*, Doc. 34 at 1; Doc. 36 at 1–2.) Indeed, the Court along with Petitioner's counsel first learned that ICE intended to remove

_____

[14] *See also Mbaba v. Perez*, No. 26-70, 2026 WL 917484, at *9 (S.D. Tex. Feb. 13, 2026) ("[The March 2025 Guidance is not] sufficient under the Constitution . . . . [D]eportation without any individualized assessment of the risk of torture and persecution cannot comport with due process despite the Government's contention otherwise. Due process requires the Government to answer whether Ms. Mbaba specifically faces possible torture or persecution in Equatorial Guinea, including whether removal to Equatorial Guinea would result in 'chain refoulement' to her home country of Mauritania." (internal citation omitted)); *Esmail*, 2025 WL 3030589, at *7 ("It appears that this policy suggests that *no* further procedure – neither notice *nor* an opportunity to be heard – will be afforded to a noncitizen in instances where the third country to which the noncitizen will be removed has provided 'assurances' that are 'credible.' . . . Reliance on such blanket assurances as a substitution for notice and the opportunity to be heard cannot comport with basic due process." (citations omitted)); *Gomez*, 2025 WL 3101994, at *6 ("Thus, in accordance with the ample case law above, the Court holds that Petitioner has a due process right to receive meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports him to a third country."); *Nguyen*, 796 F. Supp. 3d at 727 ("[A] 'noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation.'" (quoting *Aden*, 409 F. Supp. 3d at 1009)).

26

Petitioner to Eswatini when Respondents' counsel disclosed this information during the Status Conference on March 10, 2026. This Court's initial *Ruling and Order* made clear that ICE could not re-detain Petitioner without adherence to the applicable regulations and without due process. Here, ICE deprived Petitioner of due process. *See, e.g.*, *A. A. R. P.*, 605 U.S. at 95 ("[N]otice roughly 24 hours before removal . . . surely does not pass muster."); *Gomez*, 2025 WL 3101994, at *6 ("Petitioner has a due process right to receive meaningful notice and opportunity to present a fear-based claim to an immigration judge before DHS deports him to a third country.").

Ultimately, the lack of adequate notice demonstrates that Petitioner's re-detention on March 9, 2026, lacked the procedural protections required by ICE's regulations and the Fifth Amendment, and therefore deprived Petitioner of due process. *See K.E.O.*, 2025 WL 2553394, at *6 (determining that petitioner was re-detained without due process where she was "given no copies of any document providing a notice of or justification for the termination of her supervised release pursuant to her OSUP"); *Misirbekov v. Venegas*, 796 F. Supp. 3d 436, 439 (S.D. Tex. 2025) ("The review process contemplated by the regulations is a meaningful individualized review . . . ."); *see also Trejo*, 807 F. Supp. 3d at 709 (citing, *inter alia*, *Mathews*, 424 U.S. at 335); *Tan-Gutierrez v. Noem*, No. 26-152, 2026 WL 194747, at *3 (S.D. Cal. Jan. 26, 2026) (collecting cases). The Court's initial *Ruling and Order* made clear that Petitioner could not be re-detained without adherence to the "revocation regulations" and without due process. Respondents have failed to comply, and Petitioner is entitled to release on this basis alone.

### 3.    *Informal Interview*

The purpose of the informal interview required by 8 C.F.R. § 241.4(l) is to is "to afford the [noncitizen] an opportunity to respond to the reasons for the revocation stated in the notification." *Abrego Garcia*, 145 S. Ct. at 1019 (statement of Sotomayor, J.) (quoting 8 C.F.R. § 241.4(l)).

"There can be little argument that ICE's requirement that noncitizens be afforded an informal interview—arguably the most bare-bones form of an opportunity to be heard—derives from the fundamental constitutional guarantee of due process." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 165 n.26 (W.D.N.Y. 2025) (citing *Jimenez v. Cronen*, 317 F. Supp. 3d 626, 650 (D. Mass. 2018)); *see also Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (cleaned up)).

There is no dispute that Gonzalez failed to conduct the informal interview required by 8 C.F.R. § 241.4(l)(1). Testifying about his interaction with Petitioner on March 10, 2026—again, just fifteen days before the evidentiary hearing—Gonzalez could not remember if he informed Petitioner that Petitioner would be removed to Eswatini; he could not recall whether he asked Petitioner for additional documents. (Doc. 69 at 141–42, 145.) And he could not recall whether he asked Petitioner to provide a written statement. (*Id.* at 145.) In fact, Gonzalez could not recall whether he asked Petitioner *any* questions. (*Id.* at 141–42.) And while AFOD Liggins "believed" that the informal interview had taken place, this belief was based solely upon the Informal Interview Form signed by Gonzalez—not Liggins's personal knowledge. The Court therefore finds that Gonzalez's interaction with Petitioner on March 10, 2026, does not satisfy the informal interview requirement. Because ICE failed to conduct the informal interview required by its regulations when re-detaining Petitioner, Petitioner is entitled to immediate release. *See Ceesay*, 781 F. Supp. 3d at 165–66 (finding that the petitioner was not afforded even minimal due process protections when ICE failed to provide him with an informal interview upon his re-detention); *Liu v. Carter*, No. 25-3036, 2025 WL 1696526, at *2 (D. Kan. June 17, 2025) (finding that "officials did not properly revoke petitioner's release pursuant to Section 241.13," in part because "petitioner was not granted the required interview upon the revocation of his release"); *Hoac v. Becerra*, No.

25-1740, 2025 WL 1993771, at *4 (E.D. Cal. July 16, 2025) (finding that the petitioner was likely to succeed on a claim that his re-detention was unlawful because "there [wa]s no indication that an informal interview was provided to [him]").

This Court's initial *Ruling and Order* made clear that ICE could not re-detain Petitioner without adhering to the applicable regulations and without due process. Considering Gonzalez's testimony that he never gave the Notice of Revocation of Release or Notice of Removal to Eswatini to Petitioner—and considering that Gonzalez did not know that an informal interview is required by ICE's regulations, that he could not recall if he asked Petitioner any questions, that he did not record any of the details of his interaction with Petitioner in the space provided on the Informal Interview Form, that he did not note whether Petitioner made any oral statements (and could not recall any such statements), and that he could not recall whether he asked Petitioner to make a written statement—it is clear that Petitioner did not receive adequate notice of the reasons for the revocation of his February 6, 2026, OSUP or a meaningful opportunity to respond to those reasons. Pursuant to the Court's initial *Ruling and Order*, this lack of due process upon re-detention warrants immediate release.

### 4.    Third Country Removal

Seemingly, Petitioner was not told that he would be removed to Eswatini specifically when his OSUP was revoked and he was taken into custody on March 9, 2026—or even on March 10, 2026, when he interacted with Gonzalez. At the evidentiary hearing on March 25, 2026, Petitioner's counsel informed the Court that Petitioner had just that morning been served with a new Notice of Removal to yet another third country—Equatorial Guinea. (*See* Doc. 69 at 13, 34 (referencing Pet.'s Exh. No. 15).) In its initial *Ruling and Order*, this Court required ICE to comply

not only with its own regulations, but with the Due Process Clause of the Fifth Amendment. The Court will do so again.[15]

ICE may not remove a noncitizen to a country if that noncitizen's "life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see also id.* § 1231(b)(2)(E)(vii) (providing for third country removal). Therefore, "a 'noncitizen must be given sufficient notice of a country of deportation that, given his capacities and circumstances, he would have a reasonable opportunity to raise and pursue his claim for withholding of deportation.'" *Nguyen*, 796 F. Supp. 3d at 727 (quoting *Aden*, 409 F. Supp. 3d at 1009).

"[B]oth the due process clause and the governing statute [8 U.S.C. § 1231(b)] place the burden on the government – regardless of whether the country of deportation is designated during or after the removal hearing – to provide a meaningful opportunity to be heard on asylum and withholding claims." *Esmail v. Noem*, No. 25-8325, 2025 WL 3030589, at *6 (C.D. Cal. Sept. 26, 2025) (quoting *Nguyen*, 796 F. Supp. 3d at 727 (quoting *Aden*, 409 F. Supp. 3d at 1010)); *see also Vazquez v. Bondi*, No. 26-577, 2026 WL 752455, at *2 (W.D. Tex. Mar. 11, 2026) ("While Respondents provide facts to suggest they did in fact provide Petitioner notice about removal to Mexico, Respondents make no mention they provided any process to adjudicate any fear-based claim. Petitioner asserts he is entitled to seek fear-based relief from a third country, which would require additional proceedings as well. Before removal to a third country can be effectuated, the

---

[15] Petitioner's alleged membership in the class certified by the District of Massachusetts in *D.V.D. v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 386, 392–93 (D. Mass 2025), does not bar the Court's consideration of his individual due process claim to the extent that it concerns his potential removal to a third country. Numerous courts have considered the same issue and determined that they are "capable of adjudicating individual claims regarding third country removal notwithstanding *D.V.D.*" *See, e.g.*, *Kumar*, 2025 WL 3204724, at *7–8 (collecting cases). Those courts have correctly emphasized that "later relief in *D.V.D.* will not prevent [a noncitizen] from being removed to [a third country] without due process in the meantime." *See Sagastizado*, 802 F. Supp. 3d at 1008.

due process clause requires that a noncitizen be afforded the opportunity to raise claims before a neutral adjudicator." (cleaned up)).

The Court will therefore again require that "the due process guaranteed by the Fifth Amendment be afforded to Petitioner, regardless of [any] policy [currently] expressed" by ICE regarding third country removal. *See Esmail*, 2025 WL 3030589, at *6.

III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Petitioner Ibrahim Mohammed's *Motion to Enforce* (Doc. 31) is **GRANTED**. Respondents shall release Petitioner within 24 hours of this Order and may only re-detain him in accordance with due process, including giving adequate notice of the reasons for revocation of release and a meaningful opportunity to be heard in response to those reasons.

**IT IS FURTHER ORDERED** that Respondents shall advise Petitioner's counsel of the date and time of Petitioner's release at least eight (8) hours prior to his release.

**IT IS FURTHER ORDERED** that Respondents and their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them are **PROHIBITED** from removing Petitioner to a country other than Ethiopia without notice and a meaningful opportunity to be heard in re-opened removal proceedings with a hearing before an immigration judge.

Signed in Baton Rouge, Louisiana, on <u>April 21, 2026</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**